**Affirmed and Opinion filed January 28, 2014.**



In The

# Fourteenth Court of Appeals

## NO. 14-12-00618-CV

## IN THE INTEREST OF S.A.H., A MINOR CHILD

**On Appeal from the 312th District Court**
**Harris County, Texas**
**Trial Court Cause No. 2006-22737**

## O P I N I O N

This is a parent's appeal from a child custody modification order granting the child's Great Aunt certain status and rights in relation to the child. In a divorce decree dissolving the marriage of S.A.H's parents, the trial court named both parents as joint managing conservators and granted Mother the exclusive right to establish S.A.H.'s primary residence. In the subsequent modification order from which this appeal is taken, the court again named both parents as joint managing conservators, but additionally named S.A.H.'s maternal Great Aunt, with whom

S.A.H. had been living for an extended period of time, as joint managing conservator. The court further granted Great Aunt the exclusive right to establish S.A.H.'s primary residence.

In five issues, Mother[1] contends that (1) section 156.101 of the Texas Family Code, which governs modifications, is unconstitutional—both facially and as applied in this case—because it permitted the trial court to award primary custody to a nonparent without application of a "parental presumption"[2]; (2) the evidence is legally and factually insufficient to support the trial court's findings that Mother voluntarily relinquished the primary care and possession of S.A.H. for at least six months and that the modification order was in the child's best interest; (3) the court abused its discretion in imposing an injunction prohibiting the parties from associating with unrelated members of the opposite sex during periods of possession; (4) the evidence was legally and factually insufficient to support the trial court's deviation from a standard possession order; and (5) the trial court abused its discretion in permitting an expert to testify who had a conflict of interest. In a footnote, Mother also suggests Great Aunt lacked standing to file her Petition to Modify. We affirm.

## I. Background[3]

S.A.H. was born on January 1, 2004. On October 23, 2006, the trial court entered a final decree of divorce dissolving the parents' marriage and naming them joint managing conservators for S.A.H. As mentioned, Mother was awarded the

---

[1] Mother is the appellant in this case. Father did not actively contest the case in the trial court and does not do so on appeal.

[2] Two amicus curiae briefs were filed in this case primarily regarding the constitutionality of section 156.101. The Texas Attorney General's Office asserts the section is constitutional, and the University of Houston Law Center Civil Clinic argues the section is unconstitutional.

[3] The background information in this opinion is taken primarily from a bench trial on the issue of modification.

right to designate the child's primary residence, and Father was given a "modified standard possession order." Over the following three years, Mother was frequently unemployed, and Mother and S.A.H. frequently moved, including into a shelter on two occasions, and lived with several different men, at least two of whom were convicted felons.

In October 2009, Mother and Great Aunt both attended a family gathering. It was the first time in about 20 years that they had seen each other. Although Great Aunt had not previously met S.A.H., then age five, Mother allowed him to go home overnight with Great Aunt, who lived in Houston. Great Aunt returned S.A.H. to Mother in Jefferson, Texas the next day. Shortly thereafter, Mother called Great Aunt, and the two arranged for Great Aunt to take S.A.H. because Mother recently had broken up with her boyfriend and had no place to stay. It was understood between them that Great Aunt would keep S.A.H. until Mother "got her life together."

To facilitate Great Aunt's care of S.A.H., Great Aunt had drafted, and Mother signed, a Durable Power of Attorney, which provided Great Aunt with "all of the rights and responsibilities for enrolling [S.A.H.] in school, obtaining and providing medical treatment, and providing [S.A.H.] with shelter." The document further states that "[Great Aunt] will remain power of Attorney [sic] for [S.A.H.] until [Mother] is able to provide a stable living environment, including and not limited to medical and housing that both [Great Aunt] and [Mother] has mutual agreement [sic]." Mother asserted that at the time she handed S.A.H. over to Great Aunt, Mother inquired whether she should forward the child support payments (presumably from Father) to Great Aunt, but Great Aunt told her to keep them. Great Aunt stated that at the time she took possession of S.A.H., she "really didn't think about" whether the arrangement would be temporary or permanent, but when

3

Mother did not ask for his return after fourteen months, Great Aunt believed she would have S.A.H. forever. The record contains significant evidence demonstrating a high quality of life for S.A.H. while living with Great Aunt and her husband, including participation in such activities as little league baseball and cub scouts.

The record contains conflicting testimony regarding the degree to which Mother attempted to be involved in S.A.H.'s life after turning him over to Great Aunt. Mother testified that Great Aunt actively frustrated her attempts to see S.A.H. over the next fourteen months by restricting her access, claiming the family was busy when Mother wanted to see S.A.H., and not inviting her to events involving S.A.H. Mother appears to concede, and there is evidence to establish, that she only visited S.A.H. on a handful of occasions over the approximately fourteen-month period between the time Mother left S.A.H. with Great Aunt and Great Aunt filed the petition to modify. These visits typically were brief and included spending Christmas at Great Aunt's home, spending time with S.A.H. at a McDonald's restaurant, taking him to see drag races (that apparently were rained out), and taking him camping once (although apparently not overnight). The paucity of visits apparently continued even after Mother moved to the Houston area in January 2010.

Great Aunt acknowledged not inviting Mother to several family events but denied ever telling Mother that she could not come visit because they were busy or had plans. Great Aunt insisted that over the fourteen months, Mother never "stepped up" to provide care, custody, or control of S.A.H. Great Aunt additionally maintained that Mother voluntarily relinquished all care, custody, and control to Great Aunt and never asked Great Aunt to return S.A.H. to her or did anything to indicate she wanted him returned.

4

On January 1, 2011, without having made prior arrangements with Great Aunt, Mother arrived at Great Aunt's house to take back possession of S.A.H. Mother stated that at that time, she felt she was financially and personally stable enough to take S.A.H. back and that she had revoked the power of attorney. She had a full-time job and was living with a boyfriend that Mother described as her fiancé (Fiancé). When they arrived at the Great Aunt's house, however, S.A.H. was at a local restaurant celebrating his birthday.[4]

On January 3, Great Aunt filed a Petition to Modify in the district court with continuing jurisdiction, alleging that Mother had voluntarily relinquished primary care and possession of S.A.H. to her for at least six months and requesting that she be named sole managing conservator of the child and given the right to designate the child's primary residence. On February 8, 2011, the trial court entered temporary orders appointing Mother and Great Aunt as joint managing conservators, and giving Great Aunt primary custody and Mother visitation rights designed to gradually increase over time. During this period, Mother and Fiancé allegedly punished S.A.H. by forcing soap into his mouth. The trial court thereafter entered a mutual injunction restricting the parties from possession of S.A.H. in the presence of an unrelated person of the opposite sex with whom the party had a dating or intimate relationship. The court further restrained the parties from using corporal punishment, which Mother had acknowledged inflicting.

In its Final Order of Modification, the court named Mother, Father, and

---

[4] Regarding this occurrence, Mother states in her brief: "Although the Mother and her fiancé had made arrangements for the return of S.A.H. and drove to the Great Aunt's home to pick him up, the Great Aunt refused to surrender S.A.H. and instead filed suit two days later. 3 RR 147; 4 RR 41." The record citations given, however, do not support the statements made. Instead, Mother acknowledged she did not contact [Great Aunt] before appearing at her house. There is no mention of any refusal by [Great Aunt] to return the child. As stated, S.A.H. was at his birthday party at the time.

Great Aunt as joint managing conservators, gave Great Aunt the exclusive right to designate the child's primary residence, gave Mother and Father each a modified standard possession order, and made the injunction against possession around unrelated members of the opposite sex permanent. In its findings of fact and conclusions of law, the court found that Mother had "voluntarily relinquished the primary care, custody, and possession of the child to . . . [Great Aunt] for at least six months" and that such relinquishment was not a result of any military duty.[5] The court further stated there were "serious concerns regarding the veracity of the testimony of [Mother] as to the relinquishment events and factors." The court also concluded that appointing Great Aunt, Mother, and Father as joint managing conservators and granting Great Aunt exclusive right to designate the child's primary residence were in S.A.H.'s best interests.

## II. Constitutionality of Section 156.101 and the Parental Presumption

Mother contends in her first issue that section 156.101 of the Texas Family Code, setting forth permissible grounds for modifying custody orders, is unconstitutional because it does not impose a parental presumption that must be overcome before rights can be taken from a parent and given to a nonparent.[6] Such a presumption is found in Chapter 153 of the Family Code, which governs *original suits* involving conservatorship, possession, and access of children. *See* Tex. Fam

---

[5] *See* Tex. Fam. Code § 156.101(a)(3) and (b). It is undisputed that Mother's conduct was not a result of any military duty.

[6] While Mother presents a thorough analysis of the constitutional question raised, she relies primarily on the United States Supreme Court's opinion in *Troxel v. Granville*, 530 U.S. 57 (2000). In *Troxel*, the Court held a Washington visitation statute unconstitutional as applied because it permitted "[a]ny person" to petition for visitation rights "at any time" and authorized granting visitation whenever the trial court determined that "visitation may serve the best interest of the child." *Id*. at 60, 73. The Court specifically stated that awarding grandparents visitation rights in that case—based only on the trial court's belief that it was in the children's best interest—violated the mother's due process right to make decisions regarding the care, custody, and control of her children. *Id*.

Code § 153.131(b) (establishing rebuttable presumption that a parent is to be appointed as managing conservator). Chapter 153 also establishes bases for rebutting the presumption, including sections 153.131(a) (when appointment of a parent "would significantly impair the child's physical health or emotional development"), 153.131(b) (when there is a finding of a history of family violence involving the parent, and 153.373 (when "the parent has voluntarily relinquished actual care, control, and possession of the child to a nonparent . . . for a period of *one year or more* [and] the appointment of the nonparent . . . as managing conservator is in the best interest of the child") (emphasis added). *Id*. §§ 153.131(a) and (b), 153.373; *see also Critz v. Critz*, 297 S.W.3d 464, 470 (Tex. App.—Fort Worth 2009, no pet.) (discussing methods for rebutting the parental presumption contained within Chapter 153).

Family Code Chapter 156 governs proceedings seeking *modification* of child support orders such as Great Aunt initiated in the present case. *See* Tex. Fam. Code §§ 156.001-.410. It does not contain any provisions either expressly recognizing a parental presumption or providing methods to rebut such a presumption. Section 156.101, the section Mother contends is unconstitutional, permits modification of custody orders when it is in the best interest of the child and either (1) circumstances have materially and substantially changed, (2) the child is 12 years of age or older and has expressed a custody preference to the court, or (3) the conservator who has the exclusive right to designate the primary residence has voluntarily relinquished primary care and possession of the child for *at least six months*. *Id*. § 156.101(a). It contains no express reference to a parental presumption.

In *In re V.L.K.*, the Texas Supreme Court confirmed that no parental presumption applies in modification proceedings. 24 S.W.3d 338, 343 (Tex. 2000)

(overruling challenge to jury charge that included an instruction that no parental presumption applied to determination of custody in modification proceeding). The court explained that in modification proceedings there may be concerns for the child's stability not present in original actions. *Id.* The *V.L.K.* court, however, did not address any constitutional challenges. *Id.*[7]; *see also Spencer v. Vaughn*, No. 03-05-00077-CV, 2008 WL 615443, at *8 & n.4-5 (Tex. App.—Austin March 6, 2008, pet. denied) (mem. op.) (rejecting application of *Troxel* and Chapter 153 in modification context and instead applying *V.L.K.* and Chapter 156); *In re M.A.S.*, No. 04-06-00629-CV, 2007 WL 2608552, at *1-2 & n.1 (Tex. App.—San Antonio Sept. 12, 2007, no pet.) (mem. op.) (mentioning *Troxel* but following *V.L.K.* in holding trial court erred in applying parental presumption in modification case, although constitutional issue was not explicitly raised).

In *In re M.N.G.*, the Fort Worth Court of Appeals considered and rejected a constitutional challenge to section 156.101 similar to the one Mother raises here: that failure to apply the parental presumption in a modification proceeding denies a parent due process. 113 S.W.3d 27, 32-36 (Tex. App.—Fort Worth 2003, no pet.).[8] This court has not taken a position regarding the constitutionality of section 156.101. *See In re C.A.M.M.*, 243 S.W.3d 211, 218-20 (Tex. App.—Houston [14th Dist.] 2008, pet. denied) (declining to address constitutional issue because appellant/father did not request appointment as sole managing conservator for the

---

[7] *V.L.K.* issued 17 days after the United States Supreme Court's *Troxel* opinion was issued. *See supra* n.6.

[8] The *M.N.G.* court held that a parent's due process rights, as recognized in *Troxel*, are adequately protected by section 156.101. 113 S.W.3d at 32-36. Among other analyses, the court pointed out that in the modification context, the State has a compelling interest to protect a child's need for stability and that in requiring a showing of best interest, the section had been interpreted by courts to include consideration of acts or omissions of the parent and whether a change in custody would be harmful to the child. *Id.* at 34-35 (citing *Holley v. Adams*, 544 S.W.2d 367, 371-72 (Tex. 1976) and its progeny).

child or the right to designate the child's primary residence in his pleadings and only raised the issues after the order of modification was entered).[9] And we need not do so now. We hold that, even if a parental presumption applied, the trial court did not err in granting certain rights to Great Aunt under other unchallenged sections of the Texas Family Code; therefore, we need not resolve the constitutional issue raised. *See In re B.L.D.*, 113 S.W.3d 340, 349 (Tex. 2003) ("As a rule, we only decide constitutional questions when we cannot resolve issues on nonconstitutional grounds."); *In re J.F.C.*, 96 S.W.3d 256, 277-79 (Tex. 2002) (orig. proceeding) (holding evidence conclusively established one ground for termination, making alleged charge error of constitutional dimensions harmless); *In re R.T.K.*, 324 S.W.3d 896, 899-901 (Tex. App.—Houston [14th Dist.] 2010, pet. denied) (holding in suit seeking modification of prior conservatorship that even if parental presumption applied, it had been rebutted); *cf. Behzadpour v. Bonton*, No. 14-09-01014-CV, 2011 WL 304079, at *3 n.2 (Tex. App.—Houston [14th Dist.] Jan. 27, 2011, no pet.) (mem. op.) (holding that, even if presumption that attorney possessed actual authority to enter settlement applied to facts of case,

---

[9] In *C.A.M.M.*, we also discussed the concern for stability as a driving force behind the lack of a parental presumption in Chapter 156:

> By including the parental presumption in original suits affecting the parent-child relationship but not in suits for modification of conservatorship, the Legislature balanced the rights of the parent and the best interest of the child. On one hand, "the interest of parents in the care, custody, and control of their children" has been described as "perhaps the oldest of the fundamental liberty interests" recognized by the United States Supreme Court. On the other hand, it is the public policy of this State to resolve conservatorship disputes in a manner that provides a safe, stable, and nonviolent environment for the child.

> The Legislature has determined that when these two interests compete . . . the child's interest in stability prevails over the parent's right to primary possession. Thus, when statutory requirements are met, the parent's right to primary possession must yield to the child's right to a safe, stable home.

243 S.W.3d at 216; *see also In re R.T.K.*, 324 S.W.3d 896, 900-01 (Tex. App.—Houston [14th Dist.] 2010, pet. denied) (quoting *C.A.M.M.*).

the presumption had been rebutted by affirmative proof the attorney was not so authorized).

## A. Even if a Parental Presumption applied, it was rebutted

### 1. Mother's Trial Arguments

Mother urged throughout the pretrial proceedings and the trial itself that the case should properly be considered an original action and not a modification. Mother argued that, since Great Aunt had not been a party to the original suit, i.e., the divorce action between Mother and Father, she could not file a modification of the child custody orders resulting from that action. Mother argued this point on several occasions to the court (before and after the presentation of evidence), and in a motion to dismiss and a related trial brief. Mother further argued the statutory presumption that parents should be named managing conservators applied in the case and must be rebutted before Great Aunt could be named managing conservator with the right to designate S.A.H.'s primary residence. *See* Tex. Fam. Code §153.131. Additionally, Mother asserted the only ground Great Aunt pleaded that could rebut the presumption was voluntary relinquishment under section 153.373.[10] On these bases, Mother requested either that the case be dismissed without prejudice to refiling as an original suit or that the trial court bifurcate the issues and resolve the section 153.373 voluntary relinquishment issue first.

After the close of evidence on the final day of trial, March 8, 2012, counsel for both parties, the amicus attorney for S.A.H., and the trial judge renewed

---

[10] Under section 153.373, the presumption that a parent should be named or retained as managing conservator is rebutted by proof "the parent has voluntarily relinquished actual care, control, and possession of the child to a nonparent . . . for a period of one year or more [and] the appointment of the nonparent . . . as managing conservator is in the best interest of the child." Tex. Fam. Code § 153.373.

discussion of these contentions on the record. At the conclusion of the discussion, the judge stated he would set oral argument on Mother's motion to dismiss a week later to give all parties time to research and prepare. On March 16, 2012, Mother's counsel argued briefly that section 156.101, providing grounds to support modification, was unconstitutional both facially and as applied in this case. Counsel specifically asserted the section was unconstitutional under the dictates of the United States Supreme Court's analysis in *Troxel v. Granville*, 530 U.S. 57 (2000). Counsel then returned to his argument that Mother had not voluntarily relinquished her rights and responsibilities regarding S.A.H.[11] Mother later made more comprehensive arguments on the constitutionality of section 156.101 in her "Motion to Modify, Correct or Reform, or in the Alternative Motion for New Trial," which she filed after the court entered its modification order.[12]

## 2. Application of unchallenged Section 153.373

If we assume Mother's appellate argument is correct—that section 156.101 is unconstitutional because it disregards the parental presumption—we would look to another, unchallenged section of the Family Code to determine rights to S.A.H.'s custody. *See generally In re J.W.T.*, 872 S.W.2d 189, 190-91 (Tex. 1994) (discussing interrelated nature of several provisions spanning different chapters of

---

[11] As will be discussed, the concept of voluntary relinquishment comes into play in this case in several ways. Counsel apparently was arguing it as a ground for modification under section 156.101. Although Mother again suggests in a footnote in her brief that Great Aunt should have filed this case as an original action under Chapter 153, Mother does not raise this as a ground for reversing the trial court's order of modification.

[12] *See supra* n.6. Mother contends that section 156.101 is unconstitutional for essentially the same reasons as the Washington visitation statute addressed in *Troxel*: it permits infringement of her parental rights based essentially on the trial court's own view of the best interest of the child. Mother contends that to pass constitutional muster, the Texas statue needed to require (or the court needed to find) either that she was an unfit parent or that actual or potential harm would result to the child if she was given primary custody, also citing *Parham v. J.R.*, 442 U.S. 584, 603 (1979). We discuss this argument more fully below.

the Family Code); *R.T.K.*, 324 S.W.3d at 899-901 (considering rebuttal of parental presumption under Chapter 153 in suit filed by nonparent subsequent to original divorce action between parents). Mother's argument to the trial court suggests we look to section 153.373. As discussed, Mother's counsel repeatedly urged the trial court to make a determination regarding voluntary relinquishment under this section, arguing it was the only ground for rebutting the parental presumption Great Aunt had properly pleaded. If courts were required to apply a parental presumption in modification suits involving both a parent and a nonparent such as is required under Chapter 153 for original suits, it would be reasonable to permit rebuttal of that presumption via the grounds available under Chapter 153. *See In re J.M.W.*, No. 09-08-00295-CV, 2009 WL 6031287, at *7 (Tex. App.—Beaumont Mar. 11, 2010, pet. denied) (mem. op.).[13]

On appeal, however, Mother asserts that "*Troxel* imposes a requirement that parental unfitness or actual or potential harm to a child be established as an essential element for modification by a non-parent," although neither section 153.131(b) nor section 153.373, which Mother has not challenged, contain such

---

[13] Chapters 153 and 156 are both contained within Subtitle B (Suits Affecting the Parent-Child Relationship) of Title 5 (The Parent-Child Relationship and the Suit Affecting the Parent-Child Relationship) of the Texas Family Code. It is well-established that when part of a statutory scheme is ruled unconstitutional, a court should endeavor to sever the unconstitutional aspects and apply the remainder of the statutory scheme. *See, e.g., Cash Am. Int'l Inc. v. Bennett*, 35 S.W.3d 12, 22-23 (Tex. 2000) (Owen, J., dissenting); *Geeslin v. State Farm Lloyds*, 255 S.W.3d 786, 797 (Tex. App.—Austin 2008, no pet.); *see also* Tex. Gov't Code § 311.032 (c) (providing that when any provision of a statute not containing its own statement regarding severability is held invalid facially or as applied, the invalidity does not affect other provisions of the statute or their application). Chapter 153 contains the legislature's policy determinations regarding rebuttal of the parental presumption in cases in which the parental presumption applies. *See* Tex. Fam. Code §§ 153.131 and 153.373. If the parental presumption must constitutionally apply to modifications under Chapter 156, at least when the party seeking modification is a nonparent who was not a party to the first action, then the rebuttal provisions of Chapter 153 should apply as the policy set forth by the legislature and for consistency's sake within Title 5, Subtitle B of the Family Code.

12

requirements.[14] In fact, the *Troxel* court *expressly declined* to address whether a showing of unfitness or harm is required before rights can be taken from a parent and given to a nonparent. 530 U.S. at 73 (plurality op.); *see also id.* at 77 (Souter, J., concurring in judgment); *id.* at 86 (Stevens, J., dissenting) ("[W]e have never held that the parent's liberty interest in [the parent-child] relationship is so inflexible as to establish a rigid constitutional shield, protecting every arbitrary parental decision from any challenge absent a threshold finding of harm."); *id.* at 97–99 (Kennedy, J., dissenting); *M.N.G.*, 113 S.W.3d at 32-33 (pointing out *Troxel* court's refusal to consider whether showing of unfitness or harm is constitutionally required and concluding that it is not required).[15] Indeed, the tenor of the *Troxel* opinion suggests a reluctance to place strict mandates on state legislatures; the Court balked only at what it called "the sweeping breadth" of the Washington nonparental visitation statute and the "application of that broad, unlimited power in this case" but did not dictate any bright-line rules for statutes affecting parental rights. 530 U.S. at 73.

In sum, even if Mother's constitutional challenge to section 156.101 were correct and a parental presumption had to be employed in this case, section 153.373 would permit the presumption to be rebutted under certain circumstances.

---

[14] The Beaumont Court of Appeals rejected a constitutional challenge to sections 153.131 and 153.373 in *J.M.V.*, 2009 WL 6031287, at *7.

[15] Mother's other citation for the proposition that a state may intrude upon a parent's rights only when there is a finding either the parent is unfit or there is a substantial risk of harm to the child's physical or mental health is equally unavailing. In *Parham*, the Supreme Court considered an action brought on behalf of minor children challenging a Georgia law authorizing voluntary admission of children to mental health facilities by their parents or guardians. 442 U.S. at 587-88. At no point in the opinion does the Court state the proposition for which Mother cites the case. We acknowledge, however, that the question of whether *Troxel* or other Supreme Court precedent requires a showing of harm or potential harm to children before a state can interfere with parenting decisions is a subject of considerable disagreement among jurisdictions. *See, e.g., Jones v. Jones*, 307 P.3d 598, 606-07 (Utah Ct. App. 2013) (collecting cases in grandparent visitation context).

We now consider whether one such circumstance, voluntary relinquishment, was established on our record.

**B.  Voluntary Relinquishment Under the Family Code, the Pleadings, and the Court's Findings**

The Family Code contains three relevant provisions regarding the rights of a nonparent who has had possession of a child.  Section 102.003 of the code grants standing to file an action to "a person, other than a foster parent, who has had *actual care, control, and possession* of the child for *at least six months* ending not more than 90 days preceding the date of the filing of the petition."  Tex. Fam. Code § 102.003(9) (emphasis added).[16]  In a footnote in her brief, Mother suggests Great Aunt does not have standing to bring the present action.[17]

Pursuant to section 156.101, a court may modify a conservatorship order if modification would be in the child's best interest and, among other possibilities, "the conservator who has the exclusive right to designate the primary residence of the child has *voluntarily relinquished* the *primary care and possession* of the child to another person *for at least six months*."  *Id*. § 156.101(a)(3) (emphasis added). Great Aunt based her modification request on this subsection.

Under section 153.373, the presumption that a parent should be named or retained as managing conservator is rebutted by proof "the parent has *voluntarily relinquished actual care, control, and possession* of the child to a nonparent . . . for a period of *one year or more*, a portion of which was within 90 days preceding the date of . . . filing of the suit [and] the appointment of the nonparent . . . as

---

[16] Under section 156.002, a person who has standing as provided in Chapter 102 of the Code may file a suit for modification.  *Id*. § 156.002(b).  This ground for modification does not apply when the conservator relinquished care and possession during certain types of military duties.  *See id*. § 156.101(b).  The trial court specifically found this was not the case here.

[17] *See infra* n.30.

14

managing conservator is in the best interest of the child." *Id*. § 153.373 (emphasis added).[18] Even if Mother's constitutional challenge to section 156.101 were correct and a parental presumption had to be employed, section 153.373 provides an unchallenged ground for rebutting that presumption. *See J.M.W.*, 2009 WL 6031287, at *7-8 (holding voluntary relinquishment meeting requirements of section 153.373 rebutted parental presumption and affirming appointment of nonparent as joint managing conservator with right to establish primary residence).

Great Aunt pleaded for a modification based on Mother's voluntary relinquishment of S.A.H.'s primary care and possession for at least six months. The trial court, in its findings of fact, held that Mother "*voluntarily relinquished the primary care, custody, and possession* of the child to . . . Great Aunt for *at least six months* (emphasis added)." This finding does not exactly match any of the three Family Code provisions discussed above, but appears to be a finding aimed at modification under section 156.101(a)(3), only adding a finding that Mother relinquished "custody" to Great Aunt for at least six months.[19] As explained below, we conclude the evidence supports this finding and that, having found voluntary relinquishment, undisputed evidence establishes that the relinquishment lasted for a period of one year or more.[20] Therefore, even if

---

[18] Mother does not dispute that the relinquishment continued to within 90 days before Great Aunt filed suit.

[19] The court further specifically stated in its findings that there were "serious concerns regarding the veracity of the testimony of [Mother] as to the relinquishment events and factors." Additionally, the trial court found that appointing Great Aunt as a joint managing conservator (along with Mother and Father) and granting Great Aunt the right to designate primary residence were in S.A.H.'s best interests. On appeal, no party challenges the trial court's use of nonstandard language in its findings of fact, particularly the addition of the term "custody" in its voluntary relinquishment finding.

[20] The question of voluntary relinquishment was hotly contested in the trial court before, during, and after the presentation of evidence, and application of section 153.373 itself was debated with Mother urging its application. In the light of these discussions, Great Aunt put on evidence of relinquishment for over a year without objection from Mother. *See, e.g., Kohannim*

Mother's constitutional challenge to section 156.101 were correct and section 153.373 were the statute employed in this case, the trial court did not abuse its discretion in awarding custody to Great Aunt

## C. Evidence of Mother's Voluntary Relinquishment[21]

A trial court's modification order in a family law case may be reversed only when it appears from the record as a whole that the trial court abused its discretion. *Wolford v. Stamper*, 801 S.W.2d 108, 109 (Tex. 1990). Under this standard, legal and factual sufficiency are not independent grounds for review, but are relevant factors in determining whether the trial court abused its discretion. *Flowers v. Flowers*, 407 S.W.3d 452, 457 (Tex. App.—Houston [14th Dist.] 2013, no pet.). A trial court abuses its discretion when it acts arbitrarily or unreasonably or when it clearly fails to correctly analyze or apply the law. *See In re D.S.*, 76 S.W.3d 512, 516 (Tex. App.—Houston [14th Dist.] 2002, no pet.).

The Family Code does not define "voluntarily relinquish" as that term is used in section 153.373. In construing a statute, our aim is to determine and give effect to the legislature's intent, and we begin with the plain and common meaning of the statute's words. *Tex. West Oaks Hosp., LP v. Williams*, 371 S.W.3d 171, 177 (Tex. 2012). Among other options, "relinquish" is commonly defined as meaning to "give up," and "voluntarily" is defined as meaning "proceeding . . .

---

*v. Katoli*, No. 08-11-00155-CV, 2013 WL 3943078, at *7 (Tex. App.—El Paso July 24, 2013, pet. filed) ("When evidence relevant to both a pled and an unpled issue has been admitted without objection, the doctrine of trial by consent should not be applied unless clearly warranted. A party's unpled issue may be deemed tried by consent when evidence on the issue is developed under circumstances indicating that both parties understood the issue was in the case, and the other party failed to make an appropriate complaint.").

[21] As will be discussed below, in her second issue, Mother challenges the sufficiency of the evidence to establish voluntary relinquishment in relation to the modification requirements under section 156.101. In this section, we address those same arguments as they would apply to voluntary relinquishment under section 153.373.

from one's own choice" or "done of one's own free will without valuable consideration or legal obligation." Webster's New Collegiate Dictionary 995, 1322 (9th ed. 1991). Thus, "voluntarily relinquish" can be construed as meaning "to give up by one's own free will."

Mother instead urges us to employ the definition crafted by the Fort Worth Court of Appeals in *Norman v. Norman*, 683 S.W.2d 548, 550-51 (Tex. App.—Fort Worth), *rev'd on other grounds*, 692 S.W.2d 655 (1985). In that case, the court was defining the phrase in the specific context of a statute authorizing a possessory conservator, in a suit for back child support, to interpose as an affirmative defense to payment that he or she was providing actual support to the child after the managing conservator voluntarily relinquished care, control, and possession of the child. *See* Tex. Fam. Code § 14.09(3) (repealed, see now Tex. Fam. Code § 157.008(a)); *Norman*, 683 S.W.2d at 550. The court defined the term in that context to require an "affirmative agreement by the managing conservator" to give care, control, and possession of the child to the possessory conservator. *Norman*, 683 S.W.2d at 550. *But see id.* at 552 (Jordan, J., dissenting) (disagreeing that such an agreement is required). Anything less than that, the court feared, might tempt a possessory conservator "to induce a child to live with him" in order to reduce his obligation to pay child support. *Norman*, 683 S.W.2d at 550. However, our analysis does not turn on whether we adopt the *Norman* court's definition because the evidence clearly established an affirmative agreement existed between Mother and Great Aunt for Great Aunt to take over care, control, and possession of S.A.H., and the trial court entered findings of fact in this regard as well.[22]

---

[22] As Mother points out, this court has utilized the *Norman* court's definition in the same context as it was written. *See Chenault v. Banks*, 296 S.W.3d 186, 191 (Tex. App.—Houston [14th Dist.] 2009, no pet.) (assessing issue under Tex. Fam. Code § 157.008(a)). In *Leighton v.*

As discussed below, the evidence in this case supports the finding that Mother voluntarily relinquished care, control, and possession of S.A.H. to Great Aunt. While the trial court limited its relevant finding of fact to a statement that Mother "voluntarily relinquished the primary care, custody, and possession of the child to . . . Great Aunt for at least six months," Mother does not cite anything in the record, and we have uncovered nothing, suggesting that her voluntary relinquishment of the child was for at least six months but less than a year. Because there is no evidence that could support a finding that the relinquishment lasted less than one year, there is no need to remand for further findings. *See Foley v. Capital One Bank, N.A.*, 383 S.W.3d 644, 649 (Tex. App.—Houston [14th Dist.] 2012, no pet.).

It is undisputed that Mother placed S.A.H. into Great Aunt's care and possession during October 2009 without any legal obligation or other external compulsion to do so and first sought to take him back in January 2011 when she showed up at Great Aunt's house but S.A.H. was not there. Mother indeed does not dispute that, for this approximately fourteen-month period, Great Aunt had possession and took care of the child. Although there is evidence Mother visited with S.A.H. outside of Great Aunt's presence on a few occasions, these visits were always short in duration and apparently did not include any overnights. There is extensive evidence that Great Aunt controlled all facets of S.A.H.'s life that a parent normally would control for those fourteen months, from school and extracurricular activities to medical treatment and birthday parties, and no appreciable evidence that Mother controlled any of these facets of S.A.H.'s life

---

*Court*, we discussed the definition in the modification context; however, in that opinion, we did not adopt the definition but only pointed out the appellant's reliance on it and that the evidence passed even that stringent test. 773 S.W.2d 63, 64-65 (Tex. App.—Houston [14th Dist.] 1989, no writ).

18

during that time period.[23]  Mother also did not financially support S.A.H. during this time.[24]

Mother emphasizes that the arrangement was expressly intended to be temporary and not permanent, but she provides no citation or analysis for the proposition that, under section 153.373, voluntary relinquishment must be intended to be permanent.  Neither the statute nor the analysis in *Norman* supports this conclusion.  683 S.W.2d at 550.[25]  Mother further argues that there was no affirmative agreement between her and Great Aunt.  To the contrary, both women testified that they agreed Great Aunt would keep S.A.H. until Mother "got her life together."  The Power of Attorney further reflects this agreement.

Mother next contends that the Power of Attorney only granted limited rights to Great Aunt, such as enabling her to enroll S.A.H. in school and obtain medical care for him, and argues that this limited grant of rights indicates Mother never ceded full control of S.A.H. to Great Aunt.[26]  The purpose of the Power of

---

[23] Although the Family Code uses the term "control" extensively, it offers no definition. *See Jasek v. Tex. Dep't of Family and Protective Servs.*, 348 S.W.3d 523, 535 (Tex. App.—Austin 2011, no pet.).  It is typically defined as meaning "power or authority to guide or manage: directing or restraining domination."  Webster's Third New Int'l Dictionary 496 (2002); *see also* Black's Law Dictionary 378 (9th ed. 2009) (defining "control" as the "power to govern the management and policies of a person").  The *Jasek* court concluded that "actual control" of a child "means the actual power or authority to guide or manage or the actual directing or restricting of the child, as opposed to legal or constructive power or authority to guide or manage the child" and "the actual exercise of guidance, governance and direction similar to that typically exercised by parents with their children."  348 S.W.3d at 535.  We agree with these definitions for purposes of analyzing the control requirement of section 153.373.

[24] Mother testified that when she handed S.A.H. over to Great Aunt, she asked Great Aunt whether she should forward the child support payments (presumably from Father) to Great Aunt, but Great Aunt told her to keep them.

[25] Mother additionally cites our opinion in *Leighton* in suggesting that an agreement must be for a fixed period of time of a year or more.  773 S.W.2d 64-65.  Although we pointed out in that case that there was an agreement for the child to stay with one party "for a year or so," there is no suggestion in the opinion that a fixed period must be agreed on in advance.  *Id*.

[26] The Power of Attorney states in part:

19

Attorney, which Great Aunt had drafted, was to ensure Great Aunt would be able to enroll S.A.H. in school and obtain medical care for him, things she may not have been able to do without the document. The allegedly limited nature of the Power of Attorney, however, does not indicate that Mother did not otherwise relinquish control regarding S.A.H. It appears aimed instead at preventing any problems Great Aunt might encounter in caring for S.A.H. as she was not his legal guardian at the time. As discussed above, the record demonstrates that Mother did in fact cede control over S.A.H. to Great Aunt.

Next, Mother asserts that any relinquishment of rights was not voluntary because it was based on a "false misrepresentation" by Great Aunt. While both women testified that it was originally understood between them that Great Aunt would keep S.A.H. until Mother "got her life together," Mother alleges that Great Aunt never intended to return S.A.H., and thus, the transfer was under false pretenses. Mother testified that she would not have turned S.A.H. over to Great Aunt if Great Aunt had not agreed to return him.[27] Mother does not point to any indication in the record that Great Aunt did not intend to return S.A.H. when the transfer originally was made; she only argues that Great Aunt ultimately filed the present modification action and stated once, as early as three months after taking S.A.H., that Great Aunt contemplated filing for custody. In her testimony, Great

---

> I [Mother] appoint [Great Aunt] as my agent (attorney-in-fact) to act for me in any lawful way with respect to all of the following
>
> Personal and family maintenance as it relates to my minor child[. Great Aunt] shall have all of the rights and responsibilities for enrolling my child in school, obtaining and providing medical treatment, and providing with shelter.

The Power of Attorney is not quite as limited as Mother suggests.

[27] Much of Mother's argument under this contention is geared toward the definition of "voluntarily relinquish" in the *Norman* opinion. She contends that since Great Aunt never intended to return S.A.H., there was no meeting of the minds and thus no agreement, citing *Baroid Equipment, Inc. v. Odeco Drilling, Inc.*, 184 S.W.3d 1, 17 (Tex. App.—Houston [1st Dist.] 2005, pet. denied), for general principles of contract formation.

Aunt explained that she contemplated filing for custody because she was concerned about S.A.H.'s having contact with Mother's on-again, off-again boyfriend. Great Aunt told Mother of her concern and decided not to file for custody at that time. According to Great Aunt, she ultimately decided to file for custody only when Mother showed up on S.A.H.'s birthday to take him back without any warning or arrangements being made. She cited concern for the child's stability as a primary factor behind her decision. It is clear from her testimony that Great Aunt's decision evolved over time. There is no evidence that at the time of the original transfer, she did not intend to return S.A.H. to Mother.

Mother relies heavily on *Critz v. Critz*, in which the court found no evidence of voluntary relinquishment. 297 S.W.3d 464, 470 (Tex. App.—Fort Worth 2009, no pet.). In *Critz*, there was evidence the parent was physically apart from the child for a time and an arrangement was made for the child to stay with grandparents. *Id*. at 473-74. A number of factors, however, make *Critz* readily distinguishable from the present case. For example, in *Critz*, parent and child both lived in the grandparents' residence for several months of the alleged one-year relinquishment period, and they saw each other the majority of days during that time. *Id*. at 474. Additionally, the grandmother in *Critz* testified that even after the parent moved out, the parent was "still involved in decisions regarding" the child and "never actually, really relinquished . . . control completely." *Id*. Mother cites to no such evidence of contact, participation, or control in the present case.

Mother additionally relies upon *In re J.E.*, wherein the court affirmed the trial court's finding that the parental presumption had not been overcome, pointing out that it involved a similar agreement for nonparents to care for the children until the parent could "get back on [her] feet." No. 09-09-00476-CV, 2010 WL 5232977, at *6, 8, 10 (Tex. App.—Beaumont Dec. 16, 2010, no pet.) (mem. op.).

21

In *J.E.*, there was evidence the parent attempted to get the children back "multiple times," including once with the help of the police, but the nonparents refused and untruthfully claimed to have a restraining order against the parent. *Id.* at *6, 10. There is no indication in the record before us that Mother ever requested S.A.H.'s return prior to 2011.

For these reasons, we disagree with Mother's arguments. The record demonstrates Mother voluntarily relinquished care, control, and possession of S.A.H. to Great Aunt for twelve months or more as required by section 153.373 for rebuttal of any parental presumption that may apply in this case.

### D. Best Interests of the Child

In order to rebut the parental presumption under section 153.373, a nonparent must additionally show that to do so would be in the child's best interest. Tex. Fam. Code § 153.373(2). Mother challenges the evidence supporting the court's best interest finding in her second issue, in which she contests the finding that modification of the custody order is in S.A.H.'s best interest under section 156.101(a) of the Family Code, but the contentions under that issue are equally applicable to the best interest analysis under section 153.373.

Trial courts have wide latitude in determining a child's best interest. *Gillespie v. Gillespie*, 644 S.W.2d 449, 451 (Tex. 1982); *In re L.D.W.*, No. 14-11-00438-CV, 2013 WL 2247383, at *8 (Tex. App.—Houston [14th Dist.] May 21, 2013, no pet.) (mem. op.). Texas courts typically utilize the so-called *Holley* factors in cases requiring a best interest analysis. *Holley v. Adams*, 544 S.W.2d 367, 371-72 (Tex. 1976).[28] These factors include: (1) the desires of the child; (2)

---

[28] The Family Code does not specify the factors to be used in determining best interest, but courts in numerous contexts involving a "best interest" analysis have looked to the factors set forth in *Holley*, a parental rights termination case in which the supreme court set out a non-exhaustive list of factors for determining a child's best interest. 544 S.W.2d at 371-72; *see also*

the emotional and physical needs of the child now and in the future; (3) the emotional and physical danger to the child now and in the future; (4) the parental abilities of the individuals seeking custody; (5) the programs available to assist these individuals to promote the best interest of the child; (6) the plans for the child by these individuals or the agency seeking custody; (7) the stability of the home or proposed placement; (8) the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and (9) any excuse for the acts or omissions of the parent. *Id.* Proof of best interest is not limited to these factors, nor do all factors always apply in every case. *In re C.H.*, 89 S.W.3d 17, 27 (Tex. 2002); *L.D.W.*, 2013 WL 2247383, at *8.

Regarding best interest, Mother points to her own testimony that she is in a stable relationship, has been employed for over a year, and neither she nor Fiancé has a criminal record. Mother further testified regarding her plans for S.A.H., including where he would go to school if he lived with her and that she was setting up a room for him in the house where she is living. She points out that Great Aunt and her husband both have prior criminal convictions (theft by check for her and DWI and cocaine possession for him) and that Great Aunt has taken S.A.H. off his ADHD medication without a doctor's advice to do so. Mother additionally cites her own testimony suggesting Great Aunt has not supported the strengthening of Mother's relationship with S.A.H. and the Great Aunt's admission that she and her husband do not correct S.A.H. when he calls them "mom" and "dad." Lastly, Mother cites to the testimony of a high school friend that Mother is a good parent.

On the other hand, there is considerable evidence in the record regarding

---

*In re Doe 2*, 19 S.W.3d 278, 282 (Tex. 2000) (applying *Holley* factors in judicial bypass case); *Zeifman v. Michels*, 212 S.W.3d 582, 595 (Tex. App.—Austin 2006, no pet.) (applying *Holley* factors in suit involving modification of conservatorship); *In re N.A.S.*, 100 S.W.3d 670, 672-73 (Tex. App.—Dallas 2003, no pet.) (applying *Holley* factors in grandparent access determination).

Mother's history of unstable and serial relationships, inability to provide a stable home or keep employment, and disinterest in S.A.H.'s life when he was in Great Aunt's care. Mother moved S.A.H. through many living situations, including with convicted felons and in shelters, and she handed S.A.H. over to a relative he had met only recently and thereafter only saw him sporadically. The evidence further supports the conclusion that Great Aunt took in S.A.H. and provided him stability, perhaps for the first time in his life. Both S.A.H.'s mental health counselor and Great Aunt testified that he was doing well in Great Aunt's care and expressed concerns should he be placed back in Mother's primary care.[29] There also was testimony that S.A.H. did not enjoy his visitation periods with Mother and that Mother used inappropriate disciplinary methods with S.A.H.; the trial court, in fact, made a finding of fact regarding the latter allegation.

As finder of fact and sole judge of the credibility of the witnesses, the trial court was free to disregard any or all of Mother's self-serving testimony as well as that of Fiancé and her high school friend. *See, e.g., Chafino v. Chafino*, 228 S.W.3d 467, 472 n.8 (Tex. App.—El Paso 2007, no pet.). Likewise, the court was within its discretion in accepting as true the testimony of Great Aunt and other witnesses supporting its best interest determination. Given the trial court's wide latitude in determining best interest, we conclude that the record contains sufficient evidence to support the court's determination that modification of the custody order is in S.A.H.'s best interest. *See Gillespie*, 644 S.W.2d at 451; *Holley*, 544 S.W.2d at 371-72; *L.D.W.*, 2013 WL 2247383, at *8.

We further conclude that even if a parental presumption were constitutionally required in this case, the presumption would be rebutted under

---

[29] Admission of the counselor's testimony is the subject of Mother's fifth issue, which is discussed below.

24

section 153.373 because the record demonstrates Mother voluntarily relinquished care, control, and possession of S.A.H. to Great Aunt for twelve months or more. Accordingly, we need not consider Mother constitutional challenge. We overrule Mother's first issue.

### III. Modification

In her second issue, Mother contends that the trial court abused its discretion in determining that Great Aunt satisfied the prerequisites for modifying a custody order under section 156.101, which, as discussed, contains several grounds supporting modification. Tex. Fam. Code § 156.101(a). The court found that a modification was in order because it was in the best interest of S.A.H. and Mother had voluntarily relinquished primary care and possession of S.A.H. for at least six months to Great Aunt. *See id*. We have already determined above that the evidence established Mother voluntarily relinquished actual care, custody, and control of S.A.H. to Great Aunt for at least twelve months, that the change in custody was in S.A.H.'s best interest, and thus any applicable parental presumption was overcome. Based on that same evidence and reasoning, we hold that the evidence supports the trial court's determination that modification was proper. Accordingly, we overrule Mother's second issue.[30]

### IV. "Morality Injunction"

Mother asserts in her third issue that the trial court abused its discretion in

---

[30] As mentioned, Mother additionally suggests in a footnote in her brief that Great Aunt lacks standing to bring a modification proceeding because there is inadequate evidence to show Mother voluntarily relinquished actual care, control, and possession of the child for at least six months ending not more than 90 days preceding the date of the filing of the petition. *See* Tex. Fam. Code § 102.003(9). The same evidence that established Mother voluntarily relinquished actual care, custody, and control of S.A.H. to Great Aunt for at least twelve months also establishes voluntary relinquishment for six months continuing to within 90 days of Great Aunt's filing of her petition to modify. Accordingly, the record establishes Great Aunt had standing.

25

imposing an injunction prohibiting the parties "from allowing the child to be in the presence of an unrelated person of the opposite sex with whom the party has a dating or intimate relationship at any time." She complains that the evidence is legally and factually insufficient to support the court's determination, the injunction is overly broad, and it violates her constitutional right of association. Again, the sufficiency of the evidence is not a separate analysis in suits affecting the parent-child relationship but is a factor in considering whether the court abused its discretion. *T.J.L.*, 97 S.W.3d at 266. The trial court has broad discretion in fashioning restrictions on a parent's possession and access that are in the best interest of the child; however, restrictions on possession cannot "exceed those that are required to protect the best interest of the child," Texas Family Code § 153.193, and there must be record evidence to support a finding that a restriction is in the child's best interest. *Moreno v. Perez*, 363 S.W.3d 725, 739 (Tex. App.—Houston [1st Dist.] 2011, no pet.).

The trial court stated in its findings of fact that it was imposing the prohibition because Mother "had no intention of changing her behavior to avoid relationships with live-in boyfriends." There was evidence at trial that Mother had a history of serial relationships with live-in boyfriends, some of whom had criminal backgrounds, even while S.A.H. was in her primary care. There also was evidence from which the trial court could have concluded that these living arrangements were damaging to S.A.H. Both Great Aunt and S.A.H.'s counselor testified regarding their concerns. There was testimony from multiple sources regarding an incident in which Mother and Fiancé forced soap into S.A.H.'s mouth. In short, given the "here-today-gone-tomorrow" aspect of Mother's past relationships, the trial court could have reasonably concluded that limiting S.A.H.'s contact with men his mother was dating would be in the child's best

26

interest.

Mother points to her own testimony and that of Fiancé that they were engaged in a stable relationship and intended to get married. As finder of fact, however, the trial court was free to disregard their testimony. *See Chafino*, 228 S.W.3d at 472 n.8. Mother further testified that none of her boyfriends ever abused S.A.H. or took drugs or abused alcohol in front of him. However, even if the trial court believed this testimony, it does not establish that S.A.H. was unharmed by experiencing the succession of boyfriends. Lastly, Mother argues that there is no evidence she would continue her prior pattern of behavior. But evidence of the pattern of behavior is itself evidence on which the court could have relied in concluding it is likely to continue in the future. "Past is often prologue." *Ray v. Burns*, 832 S.W.2d 431, 435 (Tex. App.—Waco 1992, no writ) (considering mother's past conduct in assessing best interest of child). Considering the evidence as a whole, the court's finding is supported by sufficient evidence.

Mother next asserts that the permanent injunction was overly broad. As stated, a trial court has broad discretion in fashioning restrictions on a parent's possession and access that are in the best interest of the child. *E.g., Roberts v. Roberts*, 402 S.W.3d 833, 843 (Tex. App.—San Antonio 2013, no pet.); *Moreno*, 363 S.W.3d at 739. Mother suggests that the injunction makes it difficult for S.A.H. to develop a relationship with Fiancé before the wedding takes place. We interpret this as an argument that the restriction in question exceeds what is required to protect S.A.H.'s best interest. *See* Tex. Fam. Code § 153.193. The trial judge, however, may have decided in his discretion that the potential benefit of developing a relationship pre-marriage was outweighed by the possible harm to S.A.H. and the possibility that no wedding may ever take place. *See Moreno*, 363 S.W.3d at 739.

Mother cites *Moreno* and *Peck v. Peck*, 172 S.W.3d 26, 32-35 (Tex. App.—Dallas 2005, pet. denied), as approving "morality injunctions" that limited such contact only overnight. Mother, however, misreads the *Moreno* case. The injunction in *Moreno* originally required that the appellant/mother "exercise her entire period of possession and access without the presence of *any unrelated adult companions*." 363 S.W.3d at 739 (emphasis added). The First Court of Appeals reformed the injunction to change "unrelated adult" to "unrelated adult male." *Id.* at 739-40. The court did not reform the injunction so that it only prohibited contacted during overnight visitations as Mother suggests; indeed, the court concluded that the evidence presented supported the conclusion that it was in the trial court's discretion to enter an order that all visitation take place outside the presence of adult male companions. *Id.* at 739.

The facts in *Moreno* are similar to those in the present case, with evidence indicating the mother of the children moved the children in with several different men in succession. *Id.* We concur with the *Moreno* court's conclusion that "[a] parent's living with a boyfriend or girlfriend, after having exposed a child to 'several different people in dating relationships,' can support a finding that it is in a child's best interest not to visit with a parent while a non-relative boyfriend or girlfriend is present." *Id.* (quoting *Peck*, 172 S.W.3d at 33–35). Mother does not cite any cases in which courts on similar facts have held otherwise. The trial court in this case may reasonably have felt that the ban on any contact with boyfriends was justified due to the serial nature of Mother's relationships and the potential harm to S.A.H..

Lastly, Mother argues that the injunction violated her right to freedom of association and guarantee of liberty, citing the First and Fourteenth Amendments to the United States Constitution. U.S. Const. amends. I and XIV, § 1. She does

not, however, develop this argument beyond stating the proposition and citing the constitution. It is therefore not properly briefed. *See* Tex. R. App. P. 38.1(i) (requiring that an appellant's brief "contain a clear and concise argument for the contentions made, with appropriate citations to authorities and to the record"); *Bhatia v. Woodlands N. Houston Heart Ctr., PLLC*, 396 S.W.3d 658, 666 n.9 (Tex. App.—Houston [14th Dist.] 2013, pet. denied) (declining to make appellant's argument for him). Having considered and rejected Mother's properly-briefed challenges to the injunction prohibiting association with unrelated members of the opposite sex during periods of possession, we overrule her third issue.

## V. Deviation from Standard Possession Order

In her fourth issue, Mother contends that the trial court abused its discretion in deviating from a standard possession order, specifically by awarding her weekend possession on only the second and fourth weekend of each month and not the first, third, and fifth weekends, as a standard possession order would have provided. *See* Tex. Fam. Code § 153.312(a)(1).[31] In short, Mother complains that she loses having a third weekend of visitation in months in which there are five weekends. As Mother points out, in suits affecting the parent-child relationship, there is a rebuttable presumption that a standard possession order is in the best interest of the child. *See id.* § 153.252. A court may deviate from the terms of the standard order, if those terms would be unworkable or inappropriate and against

---

[31] We interpret Mother's fourth issue challenging the sufficiency of the evidence to support the order on weekend visitation as a contention the court abused its discretion. *See In re Marriage of Swim*, 291 S.W.3d 500, 505 (Tex. App.—Amarillo 2009, no pet.) ("[A] reviewing court's holding that a trial court did not abuse its discretion [in deviating from the standard possession order] implies that the evidence contained in the record rebutted the presumption that the standard possession order was reasonable and in the child's best interest."). We give wide latitude to a trial court's determinations on possession and visitation issues, reversing the court's decision only if it appears that the court abused its discretion in light of the record as a whole. *Gillespie*, 644 S.W.2d at 451.

the child's best interest, but it must include in the order the reasons for any deviation. *See id.* §§ 153.253 and 153.258; *see also Ray*, 832 S.W.2d at 437. In ordering terms other than those contained in a standard order, a court may consider (1) the age, developmental status, circumstances, needs, and best interest of the child; (2) the circumstances of the managing conservator and of the parent named as a possessory conservator; and (3) any other relevant factors. Tex. Fam. Code § 153.256.

Mother additionally complains that the trial court failed to make findings of fact in regards to this departure from the standard possession order. The court, however, did provide supplemental findings of fact on this issue, indicating that the court modified the standard order regarding weekends because the parties agreed to the modification "to compensate for other possession and access orders regarding children not the subject of this suit and to de-conflict [Mother's] weekend possession and access from the 1st weekend possession and access awarded to [Father.]" Although there is some representation in the record during the discussion of this issue that the parties had reached an agreement, at least regarding a switch of the first and third weekends for the second and fourth, it is not entirely clear that there was an agreement regarding the fifth weekend.

Although not mentioned by Mother in her appeal, the parties and the court appear to have been aware of and concerned that there are *three* conservators in this case, and that Father was entitled to possession of S.A.H. on at least the first weekend of each month, which he had been awarded in the divorce decree, as the pleadings in the modification action did not provide grounds for taking away that weekend. As Great Aunt's counsel and the amicus attorney pointed out, if Father retained possession on the first weekend, and Mother was awarded possession on the second, fourth, and fifth weekends, Great Aunt would only have weekend

30

possession once out of every four to five weekends.

In her appellate argument, Mother does not mention or discuss the trial court's supplemental findings, the discussion on the record, or the fact that weekend visitation needed to be divided among three conservators and not the two for which the standard possession order is designed. Instead, Mother merely asserts that there is no evidence supporting the trial court's deviation from a standard order and points to testimony from her high school friend that she was a "very loving and caring" mother. Mother has not demonstrated that the trial court abused its discretion in deviating from the standard possession order regarding weekend possession. *Cf. In re T.J.S.*, 71 S.W.3d 452, 459 (Tex. App.—Waco 2002, pet. denied) (affirming deviation from standard possession order based on such factors as the working schedules of the parties and the age of one of the conservators). Accordingly, we overrule her fourth issue.

## VI. Admission of Expert Testimony

In her fifth issue, Mother complains that the trial court abused its discretion in permitting Shaun Alan Lester, a licensed professional counselor, to testify as an expert witness.[32] Mother maintains that Lester impermissibly undertook conflicting roles in this case in that he both counseled S.A.H. and testified regarding what would be in the child's best interest.[33] According to Mother, Lester's undertaking of dual roles violated rules promulgated by the State Board of

---

[32] For an expert's testimony to be admissible, the expert must be qualified and the offered opinion must be relevant and based on a reliable foundation. Tex. Rule Evid. 702; *Exxon Pipeline Co. v. Zwahr*, 88 S.W.3d 623, 628 (Tex. 2002); *New Hampshire Ins. Co. v. Allison*, No. 01-12-00505-CV, 2013 WL 3947822, at *7 (Tex. App.—Houston [1st Dist.] Aug. 1, 2013, no pet.).

[33] Great Aunt initially hired Lester to provide counseling for S.A.H. Great Aunt's attorney subsequently requested and received a report from Lester containing his recommendations related to custody of S.A.H. Lester also apparently testified in an earlier hearing in the case.

31

Examiners of Psychologists, citing 22 Texas Administrative Code sections 465.13 and 465.18.[34]

During trial, before Lester took the stand, Mother's counsel objected to his testimony based on the same professional rules Mother relies upon on appeal. The trial judge then questioned whether those administrative rules could be construed as requiring the court to exclude the testimony, saying "Is this my problem or is it Dr. Lester's problem?" Counsel responded that the public policy of the State should be to prohibit licensed professionals from violating rules governing their conduct. Counsel, however, did not present the trial court with any basis in law for excluding the testimony. Moreover, on appeal, Mother does not cite any evidentiary rule or substantive law that supports her contention that the trial court erred in admitting Lester's testimony because of his dual roles as counselor and evaluator. *See Quijano v. Quijano*, 347 S.W.3d 345, 351-52 (Tex. App.—Houston [14th Dist.] 2011, no pet.) (declining to expand on party's conclusory argument).

The admission of expert testimony is not determined by an administrative code, but by principles governing the admissibility of evidence. There is no basis to rely on the cited sections of the Administrative Code as a basis for the inadmissibility of Lester's testimony. *See New Hampshire Ins. Co. v. Allison*, No.

---

[34] Section 465.18 contains the most relevant instructions:

When seeking or receiving court appointment or designation as an expert for a forensic evaluation a licensee specifically avoids accepting appointment or engagement for both evaluation and therapeutic intervention for the same case. A licensee provides services in one but not both capacities in the same case. . . .

The role of a psychologist in a child custody forensic engagement is one of a professional expert. The psychologist cannot function as an advocate and must retain impartiality and objectivity, regardless of whether retained by the court or as a party to the divorce. The psychologist must not perform an evaluation where there has been a prior therapeutic relationship with the child or the child's immediate family members, unless required to do so by court order.

22 Tex. Admin. Code § 465.18(b)(5), (d)(3).

01-12-00505-CV, 2013 WL 3947822, at \*7 (Tex. App.—Houston [1st Dist.] Aug. 1, 2013, no pet.) (applying Rule 702 instead of suggested administrative code provisions in determining whether witness was qualified as an expert). Consequently, we overrule Mother's fifth issue.[35]

## VII. Conclusion

Having overruled each of Mother's appellate issues, we affirm the trial court's order of modification.

/s/    Martha Hill Jamison
        Justice

Panel consists of Justices Jamison, McCally, and Busby.

---

[35] Great Aunt contended in the trial court and contends on appeal that the rules governing psychologists do not apply to Lester because he is not a licensed psychologist. The trial court also questioned whether the rules applied to Lester, and Mother argued that they did because he held himself out as providing psychological services, a fact Lester denied in his testimony. We need not make a determination as to whether the cited rules applied to Lester because even if they did, Mother has offered no basis for excluding Lester's testimony.