# IN THE SUPREME COURT OF TEXAS

No. 16-0715

IN THE INTEREST OF H.S., A MINOR CHILD

ON PETITION FOR REVIEW FROM THE
COURT OF APPEALS FOR THE SECOND DISTRICT OF TEXAS

**Argued January 10, 2018**

JUSTICE LEHRMANN delivered the opinion of the Court, in which CHIEF JUSTICE HECHT, JUSTICE GREEN, JUSTICE BOYD, and JUSTICE DEVINE joined.

JUSTICE GUZMAN filed a dissenting opinion.

JUSTICE BLACKLOCK filed a dissenting opinion, in which JUSTICE JOHNSON, JUSTICE GUZMAN, and JUSTICE BROWN joined.

Heather[1] lived in her maternal grandparents' home for the first 23 months of her life. During the last eight of those months, her grandparents were her primary caretakers and providers. The issue here is whether the grandparents, having continuously engaged in that parent-like role on a day-to-day basis, had standing to pursue a suit affecting the parent–child relationship (SAPCR) under the Texas statute conferring such standing on nonparents who have had "actual care, control, and possession of the child for at least six months." TEX. FAM. CODE § 102.003(a)(9). Both the trial court and the court of appeals concluded the grandparents lacked

---

[1] Like the court of appeals, we use the pseudonym "Heather" to refer to the child at issue.

standing. We disagree. We reverse the court of appeals' judgment and remand the case to the trial court for further proceedings.

## I. BACKGROUND

Immediately upon Heather's birth in January 2013, she and her mother moved into her maternal grandparents' home. Heather's parents were not married and did not live together. On August 29, 2013, the trial court entered an order in a pending SAPCR appointing Heather's parents joint managing conservators, with Mother having the exclusive right to designate Heather's primary residence. Broadly speaking, the order granted Father possession of Heather on alternate weekends and various holidays.

From the time of her birth until December 19, 2014, Heather primarily lived in the home of her maternal grandmother and step-grandfather (Grandparents). Mother, who struggled with alcohol addiction, also resided at Grandparents' home from August 29, 2013 until March 30, 2014.[2] On March 30, 2014, Mother moved to a sober-living facility called Oxford House to address her addiction issues. Mother, Father, and Grandparents agreed that Heather would continue to live with Grandparents while Mother was in recovery.

Mother testified that she did not have a specific time frame in mind for her stay at Oxford, though she initially anticipated being there no more than three months. She also testified that, while living at Oxford, she would go to Grandparents' house in the evenings and would "have dinner with [Heather], bathe her, put her to bed, spend time with her." The record is not clear about the frequency of these visits, although the trial court found that Mother saw Heather "on a regular basis." Mother also sometimes picked Heather up from daycare when she was able to get

---

[2] The record is unclear as to Mother's living situation before August 29.

2

a car. Father's exercise of his possession rights when Mother moved to Oxford was "sporadic" for the first few months or so, after which Heather stayed with him approximately every other weekend, sometimes commencing on Thursday.

After Mother moved to Oxford, Grandparents directed Heather's day-to-day activities and took care of her daily needs; provided her with a home, food, clothing, and shelter; and paid for her daycare. They necessarily decided when Heather would start her day, what she would eat for meals, what clothing she would wear, what activities she would participate in, whether she would be restricted from watching television or encouraged to play outside. In short, they managed and controlled her everyday activities. They also ensured that her nutritional, physical, emotional, and psychological needs were addressed, while providing her with a nurturing home. When she awoke in the middle of the night, they were there to comfort her, and when she scraped her knee, she could depend on them to stop the bleeding. Indeed, Father agreed, and the trial court found, that Grandparents were Heather's "primary caregivers" from March to October 2014.

Grandparents also took Heather to the doctor or to urgent care when necessary, although Mother and Father were also involved in medical decisions. The trial court found that both Mother and Grandmother made doctor's appointments for Heather, and Grandmother testified that Mother attended some, but not all, of those appointments. Mother provided authorization for Grandparents to take Heather to a specific doctor's office and to obtain emergency treatment. Father also testified that he authorized Grandparents to obtain necessary emergency treatment for Heather but that, on a few occasions, a medical provider obtained his consent over the phone to treat Heather. The parties generally agree, and the trial court found, that Grandparents kept Mother and Father

3

informed about Heather's daily activities and medical needs and "sought input" from them on decisions that needed to be made about her.

Mother and Father both testified that they intended the arrangement with Grandparents to be temporary while Mother was in recovery. Mother also testified, and the trial court found, that she did not intend to relinquish her care and control of Heather to Grandparents. However, by early October 2014, Mother remained at Oxford, while Heather still lived with Grandparents. On October 6, Grandparents filed a petition to modify the SAPCR order requesting that they be appointed Heather's managing conservators with the right to designate her primary residence.[3] They alleged that they had had actual care, control, and possession of Heather for six months and thus had standing to sue as nonparents under Family Code section 102.003(a)(9). Father filed a counterpetition to modify the possession order and filed a plea to the jurisdiction seeking dismissal of Grandparents' petition for lack of standing.

In January 2015, the associate judge entered temporary orders appointing Father "primary" managing conservator and granting Mother supervised visitation.[4] The trial court held a hearing on Father's plea to the jurisdiction and granted the plea, dismissing Grandparents' petition. The

---

[3] The live pleading does not use the term "sole managing conservator" or "joint managing conservator," but appears to be requesting some form of managing conservatorship. Specifically, Grandparents' second amended petition states:

> Petitioners requests [sic] that they be appointed as the persons who have the right to designate the primary residence of the child, the right, after consultation with the parents to make invasive medical decisions, the right to receive child support and the right, after consultation with the parents, to make educational decisions.

> Petitioner request [sic] that Respondent Father be continued [sic] to have standard visitation with the child per the previous order or pursuant to a schedule deemed appropriate by the Court. Petitioners request that Respondent Mother's access be continually supervised upon the times and locations determined by the Court.

[4] Mother testified that she was sober for six months but relapsed in February 2015.

4

trial court also entered an agreed order (as between Mother and Father) appointing Heather's parents joint managing conservators, granting Father the right to designate Heather's primary residence within Tarrant County, granting Mother possession of Heather "at times mutually agreed to in advance by the parties," and requiring Mother to pay child support. In its findings of fact and conclusions of law, the court determined that Grandparents did not establish that they had "actual care" or "actual control" over Heather for the six-month period preceding their petition filing.

Grandparents appealed. The court of appeals affirmed, holding that "standing under section 102.003(a)(9) cannot be gained by a nonparent exercising care, control, and possession over a child in the absence of evidence that the child's parent is unfit or has abdicated his or her own care, control, and possession over the child to the nonparent for the statutory period." ___ S.W.3d ___, ___ (Tex. App.—Fort Worth 2016) (mem. op.). We granted Grandparents' petition for review.

## II. STANDING FRAMEWORK AND STANDARD OF REVIEW

The only issue presented is whether Grandparents had standing under the Family Code to file a SAPCR seeking conservatorship of Heather. With that in mind, we note the significance of the stage of the case before us. Generally, standing involves a threshold determination of whether a plaintiff has a sufficient "justiciable interest" in the suit's outcome to be entitled to a judicial determination. *Austin Nursing Ctr. v. Lovato*, 171 S.W.3d 845, 848–49 (Tex. 2005). "Without standing, a court lacks subject matter jurisdiction" over the case, and the merits of the plaintiff's claims thus cannot be litigated or decided. *Id.* at 849; *see also Brown v. Todd*, 53 S.W.3d 297, 305 (Tex. 2001) ("The standing doctrine identifies those suits appropriate for judicial resolution."). Here, the merits of Grandparents' claims—that is, whether they should be appointed Heather's

5

managing conservators with the right to designate her primary residence—have not yet been considered by any court and are not before us. *See In re Smith*, 260 S.W.3d 568, 573 (Tex. App.—Houston [14th Dist.] 2008, no pet.) (explaining, in a suit involving grandparent access, that "whether the grandparent ultimately will succeed is a different question than whether the grandparent has the right simply to bring suit"). Thus, this case is not about whether Grandparents will prevail in their suit; it is about whether they may bring it in the first place. And without standing, Grandparents are precluded not only from seeking custody of Heather but also from seeking any type of visitation with her at all.

Standing, like other issues implicating a court's subject matter jurisdiction, is a question of law that we review de novo. *Tex. Dep't of Transp. v. City of Sunset Valley*, 146 S.W.3d 637, 646 (Tex. 2004); *Mayhew v. Town of Sunnyvale*, 964 S.W.2d 922, 928 (Tex. 1998). In evaluating standing, we construe the pleadings in the plaintiff's favor, but we also consider relevant evidence offered by the parties. *Bland Indep. Sch. Dist. v. Blue*, 34 S.W.3d 547, 555 (Tex. 2000); *Tex. Ass'n of Bus. v. Tex. Air Control Bd.*, 852 S.W.2d 440, 446 (Tex. 1993). When the trial court issues findings of fact, as it did here, we defer to those unchallenged findings that are supported by some evidence. *Tenaska Energy, Inc. v. Ponderosa Pine Energy, LLC*, 437 S.W.3d 518, 523 (Tex. 2014).

Because standing to bring a SAPCR is governed by statute, we apply statutory-interpretation principles in determining whether a plaintiff falls within the category of persons upon whom such standing has been conferred. *See Tex. Dep't of Protective & Regulatory Servs. v. Sherry*, 46 S.W.3d 857, 861 (Tex. 2001). When interpreting statutes, we presume the Legislature's intent is reflected in the words of the statute and give those words their fair meaning.

6

*In re C.J.N.–S.*, 540 S.W.3d 589, 591 (Tex. 2018). We analyze statutes "as a cohesive, contextual whole, accepting that lawmaker-authors chose their words carefully, both in what they included and in what they excluded." *Sommers v. Sandcastle Homes, Inc.*, 521 S.W.3d 749, 754 (Tex. 2017); *see also R.R. Comm'n of Tex. v. Tex. Citizens for a Safe Future & Clean Water*, 336 S.W.3d 619, 628 (Tex. 2011) ("When the Legislature uses a word or phrase in one portion of a statute but excludes it from another, the term should not be implied where it has been excluded.").

### III. ANALYSIS

Section 102.003, entitled "General Standing to File Suit," enumerates fourteen categories of persons who have standing to file a SAPCR. TEX. FAM. CODE § 102.003(a); *see also id.* § 156.002(b) ("A person or entity who, at the time of filing, has standing to sue under Chapter 102 may file a suit for modification in the court with continuing, exclusive jurisdiction."). Grandparents rely on subsection (a)(9), which confers such standing on "a person, other than a foster parent,[5] who has had actual care, control, and possession of the child for at least six months ending not more than 90 days preceding the date of the filing of the petition."[6] "In computing the time necessary for standing" under this subsection, courts "shall consider the child's principal residence during the relevant time." *Id.* § 102.003(b). We read this language to exclude

---

[5] Subsection (a)(12) confers standing on "a person who is the foster parent of a child placed by the Department of Family and Protective Services in the person's home for at least 12 months ending not more than 90 days preceding the date of the filing of the petition." TEX. FAM. CODE § 102.003(a)(12).

[6] Two other Family Code provisions that allow grandparents to seek conservatorship or possession of a child under narrow circumstances are not before us. Section 102.004, which expressly confers standing "[i]n addition to the general standing to file suit provided by Section 102.003," allows grandparents and certain other close relatives to file an original suit requesting managing conservatorship upon "satisfactory proof" that "the child's present circumstances would significantly impair the child's physical health or emotional development." And section 153.433(a) allows a court to "order reasonable possession of or access to a grandchild by a grandparent" if several conditions are met. Grandparents allege only "general" nonparent standing under section 102.003(a)(9). The fact that they are Heather's grandparents is largely immaterial.

nonparents who do not share a principal residence with a child for the statutory time period from establishing standing under section 102.003(a)(9), regardless of how extensively they participate in caring for her.[7]  In this case, the parties do not dispute that Grandparents meet the statute's "actual possession" requirement.  Rather, the dispute focuses primarily on what is required to have "actual care [and] control" of a child for the requisite time period.

The courts of appeals have diverged on the proper interpretation of this language, creating "two lines of authority . . . differing principally on what constitutes 'control' over the child." *In re Lankford*, 501 S.W.3d 681, 685 (Tex. App.—Tyler 2016, orig. proceeding).  Some courts have held that, because the modifier "actual" distinguishes "between something that exists in fact rather than as a function of legal implication," the Legislature's word choice manifests "its intent to confer standing on a person who had developed and maintained a relationship, of at least six months duration, with the child by virtue of that person's actual care, control, and possession of the child, as distinguished from a bare legal right of care, control, and possession." *Jasek v. Tex. Dep't of Family & Protective Servs.*, 348 S.W.3d 523, 535 (Tex. App.—Austin 2011, no pet.); *accord In re Lankford*, 501 S.W.3d at 690.  Applying this reasoning, the *Jasek* court held that "actual control" is "the actual power or authority to guide or manage or the actual directing or restricting of the child," "without regard to whether [the nonparent] had the legal or constructive power or authority" to do so.  348 S.W.3d at 533, 537; *see also In re S.A.H.*, 420 S.W.3d 911, 924 n.23 (Tex. App.—Houston [14th Dist.] 2014, no pet.) (agreeing with the *Jasek* court's definition of control).

---

[7] This includes, for example, babysitters, daycare providers, friends, and relatives who assist with childcare responsibilities but do not share a principal residence with the child.

8

Other courts have concluded that, considering the control requirement "in the context of the rights, duties, and responsibilities of a parent," the statute requires a "legal right of control over the child" that "includes the authority to make decisions of legal significance for the child." *In re K.K.C.*, 292 S.W.3d 788, 793 (Tex. App.—Beaumont 2009, orig. proceeding). The court in *In re K.K.C.* held that a nonparent did not have standing under section 102.003(a)(9) when the child's parent also "adequately cared for the child, and did not relinquish to [the nonparent] or abdicate her parental rights, duties, and responsibilities." *Id.* The court of appeals in this case, emphasizing parents' fundamental liberty interest in directing their children's upbringing, agreed with the latter line of authority and concluded that "standing under section 102.003(a)(9) cannot be gained by a nonparent exercising care, control, and possession over a child in the absence of evidence that the child's parent is unfit or has abdicated his or her own care, control, and possession." ___ S.W.3d at ___.

As discussed below, we agree with the *Jasek* court's analysis of the statute's plain language. By contrast, the court of appeals in this case engrafted requirements into the statute that simply aren't there.

## A. Plain Language

The Legislature did not define the phrase "actual care, control, and possession" or its constituent parts in either the standing statute or elsewhere in the Family Code. We therefore look to the terms' ordinary meaning within the statutory context. *State v. $1,760.00 in U.S. Currency*, 406 S.W.3d 177, 180–81 (Tex. 2013) (explaining that "[u]ndefined terms in a statute are typically given their ordinary meaning" and that, "when an undefined term has multiple common meanings, the definition most consistent within the context of the statute's scheme applies").

9

"Actual" means "[e]xisting in fact; real." BLACK'S LAW DICTIONARY (10th ed. 2014). The adjective precedes the uninterrupted series of nouns "care, control, and possession" and thus modifies all three. *See Iliff v. Iliff*, 339 S.W.3d 74, 80 (Tex. 2011). In the family-law context, "care" means the "provision of physical or psychological comfort to another." BLACK'S LAW DICTIONARY (10th ed. 2014). And "control" is commonly defined as "the power or authority to manage, direct, or oversee." BLACK'S LAW DICTIONARY (10th ed. 2014); *see also* WEBSTER'S THIRD NEW INT'L DICTIONARY (2002) (defining "control" as "power or authority to guide or manage[;] directing or restraining domination").[8]

The *Jasek* court concluded that these words "reflect the Legislature's intent to create standing for those who have, over time, developed and maintained a relationship with a child entailing the actual exercise of guidance, governance and direction similar to that typically exercised by parents with their children." 348 S.W.3d at 533; *see also Coons-Andersen v. Andersen*, 104 S.W.3d 630, 636 (Tex. App.—Dallas 2003, no pet.) (noting that "section 102.003(a)(9) is in complete harmony with the common law doctrine of in loco parentis: a person who assumes the duties of a parent . . . has the right to be a party in a lawsuit involving the child's custody"). We agree. The Legislature did not use the phrase "legal custody," "legal control," "constructive control," or any other language indicating that it intended formal legal authority over the child to be a condition for standing under subsection (a)(9). Had the Legislature intended to require such authority, it would have said so. *See, e.g.*, Uniform Child Custody Jurisdiction and Enforcement Act, TEX. FAM. CODE § 152.102(11), (14) (differentiating between "legal custody"—

---

[8] As noted, Grandparents' actual possession of Heather for over six months is undisputed. We therefore need not focus on that prong.

defined as "the managing conservatorship of a child"—and "physical custody"—defined as "the physical care and supervision of a child"); TEX. EDUC. CODE § 38.053 ("The student's parent or guardian or another person having legal control of the student may give consent for a student to receive ongoing services.").

Nor did the Legislature require the nonparent's care and control of the child to be exclusive. *Smith v. Hawkins*, No. 01-09-00060-CV, 2010 WL 3718546, at *3 (Tex. App.—Houston [1st Dist.] Sept. 23, 2010, pet. denied) (mem. op.); *see also In re M.P.B.*, 257 S.W.3d 804, 809 (Tex. App.—Dallas 2008, no pet.) (concluding the child's grandmother had standing under section 102.003(a)(9) even though her "actual care, control, and possession of [the child] was not exclusive"). By conditioning nonparent standing on a finding that the parents have wholly "abdicated" their parental rights to the nonparent, the court of appeals and the dissent would effectively add an exclusivity requirement that is not reflected in the statute's plain language.[9] *See Iliff*, 339 S.W.3d at 80–81 ("We have no right to engraft upon the statute any conditions or provisions not placed there by the legislature." (citation omitted)). Again, had the Legislature intended to require total "abdication" by the parent, it would have done so expressly.

The dissent opines that "actual control" cannot mean "providing daily supervision, clothing, food, transportation, and the like" because that "would be the same thing as 'care,' rendering one statutory term or the other superfluous." *Post* at ___.[10] In the dissent's view, "'control' of a child entails the power and authority to make important decisions about the child's

---

[9] Mother and Father argue that requiring parental intent to abdicate or relinquish their parental rights is not tantamount to an exclusivity requirement. We disagree. By requiring abdication, the court of appeals impliedly concluded that parents and nonparents cannot both play parental or parent-like roles in a child's life at the same time.

[10] Unless otherwise noted, references to the dissent are to JUSTICE BLACKLOCK'S writing.

11

life," and "[a]s long as the parents remain actively involved in the child's life, there is little room for anyone else to exercise the control 'typically exercised by parents' because parents themselves already occupy that unique and special role." *Id.* at ___. We cannot agree with either conclusion.

First, the fact that "actual care" and "actual control" are often exercised together does not make either term superfluous. When a nonparent takes daily responsibility for ensuring that a child is fed, clothed, and emotionally nurtured, that nonparent is taking "actual care" of the child. When a nonparent consistently makes the kinds of day-to-day decisions associated with raising a child—when she gets up and goes to bed, how much television she watches, whether she gets dessert, when she needs to go to the doctor—that nonparent is exercising "actual control" over the child. The dissent's narrow reading of "control" to encompass only the "important" decisions to be made about a child's life is supported by neither the statute nor the term's ordinary meaning. And it raises the question of which decisions are "important" enough to fall into this category.

The dissent's conflation of legal and actual control is also curious. Of course, parents whose rights have not been terminated and who have not otherwise formally granted to a nonparent the right to make decisions about the child necessarily have the legal *authority* to override the nonparent's decisions or to withdraw any express or implied permission given to the nonparent. However, this merely highlights the difference between having legal control and exercising actual control. The two do not, as the dissent asserts, necessarily go hand in hand.

Further, the court of appeals and the dissent essentially focus their analysis on the parents' conduct in evaluating nonparent standing, but the statute by its plain terms focuses on the nonparent's role in the child's life. This makes sense because the relationship that develops over time between a child and a person who serves in a parent-like role—i.e., someone who has actual

12

care, control, and possession of the child—is what justifies allowing that person to seek to preserve involvement in the child's life. We decline to hold that a parent must wholly cease exercising his or her own parental rights and responsibilities in order for a nonparent to exercise those same kinds of responsibilities and obtain standing under section 102.003(a)(9). Requiring this type of abdication would essentially amount to an imposition that parents relinquish their parental rights entirely in order for a nonparent to attain standing to seek a continued relationship with the child.[11] Nothing in section 102.003(a)(9) supports imposing such a requirement.

Finally, Mother and Father argue that a nonparent's exercise of actual care and control of a child is conditioned on the nonparent's "permanent power over a child," such that the provision of physical and psychological comfort is "more than transient in nature." They argue that a nonparent cannot satisfy section 102.003(a)(9) when, as in this case, the living arrangement was intended to be temporary. But, just as requiring legal or exclusive control over the child would improperly add language to the statute, so too would requiring intent to make the nonparent's exercise of care, control, and possession permanent. The parents do not dispute that they consented to the arrangement,[12] and however long they anticipated it lasting, the fact remains that it had

_____

[11] The dissent proposes two hypotheticals involving a father who leaves his son with a close friend during a seven-month assignment on an offshore oilrig. In the first, Father and Son talk on the phone most nights and the caretaker regularly consults with Father regarding Son's schoolwork, discipline, and extracurricular activities. In the second, Father absconds with his girlfriend. In the dissent's view, the Son's caretaker has nonparent standing in the second hypothetical but not the first. By focusing on Father's conduct, both hypotheticals ignore the relationship that has necessarily developed between Son and the caretaker while he serves in that role and as manager of Son's daily activities. Suppose facts identical to the first hypothetical, except that Father is continually assigned to offshore oilrigs over the course of seven years rather than seven months. Or suppose Father checks in with Son and caretaker once a month and is available for any necessary emergency decisions that need to be made, but otherwise leaves the day-to-day decisions to the caretaker. The dissent's all-or-nothing approach means anything short of "absconding" on the parent's part leaves the caretaker with no ability to seek to preserve *any* involvement in the child's life in the event Father subsequently decides to restrict it.

[12] Mother and Father testified that, on a few occasions during the pertinent time period, they told Grandmother they wanted Heather to live with Father, but that Grandmother "disagreed" or said "we'll talk about it." There is no

13

continued for over six months when Grandparents filed suit. *See Jasek*, 348 S.W.3d at 536 ("Presumably, a person would only be able to meet [the section 102.003(a)(9)] requirements, absent violating some other law, with some type of parental or conservator consent, actual or constructive, such as where a parent leaves a child in the care of other people for more than six months."). The statute requires six months of actual care, control, and possession, not six months of care, control, and possession *with the understanding that it is intended to be a permanent arrangement*.

In sum, a nonparent has "actual care, control, and possession of the child" under section 102.003(a)(9) if, for the requisite six-month time period, the nonparent served in a parent-like role by (1) sharing a principal residence with the child, (2) providing for the child's daily physical and psychological needs, and (3) exercising guidance, governance, and direction similar to that typically exercised on a day-to-day basis by parents with their children.[13] The statute does not require the nonparent to have ultimate legal authority to control the child, nor does it require the parents to have wholly ceded or relinquished their own parental rights and responsibilities.

---

indication in the record or the trial court's findings that Father ever refused (or attempted to refuse) to return Heather to Grandparents at the end of his periods of weekend possession, or that the parents attempted to obtain a court order.

[13] This is consistent with *Jasek*'s description of the "common threads running through the cases in which the court found actual care, control, and possession," including:

> that the person asserting standing (1) lived in the same home as the child or lived in a home where the child stayed overnight on a regular and frequent basis, (2) made financial contributions benefitting the child, (3) was involved with the child's education, and (4) was involved in matters involving the child's general upbringing, like health care, feeding, and clothing.

348 S.W.3d at 534.

## B. Application

Applying the standards enumerated above, we hold that Grandparents exercised "actual care, control, and possession" of Heather for the six-month statutory time period. A litany of facts underlie this holding.

First, as noted, it is undisputed that Heather's principal residence, from the time she was born until she was almost two, was Grandparents' home. During the six months preceding Grandparents' filing their petition, Heather spent approximately every other weekend (sometimes commencing on Thursday) at Father's,[14] but otherwise resided with Grandparents. Grandparents were her primary caregivers, providing for her everyday physical and emotional needs. They paid for her food, clothes, and daycare. They managed and directed her day-to-day activities. They took her to urgent care when necessary for emergency treatment, made some of her doctor's appointments, and took her to the doctor for checkups even when Mother made the appointments. For a child Heather's age, it is difficult to imagine what more "care" and "control" they could have exercised.[15] In short, Grandparents played a parent-like role in Heather's life on a daily basis for over six months before Grandparents filed their petition, from at least March 30 to October 6, 2014.

That Heather's parents remained involved in her life and continued to make some medical decisions on her behalf does not alter or negate that conclusion. Nor does the evidence that the

---

[14] The trial court found that Father also saw Heather more often than that, although the nature and frequency of that contact is not clear from the record.

[15] In the dissent's view, the fact that Grandparents kept Mother and Father "reasonably informed" about Heather's daily activities and medical needs and sought their input on decisions about her undercuts Grandparents' assertion of control. At best, it reflects shared decision-making on some issues, and as explained above, a nonparent's control over a child need not be exclusive.

15

arrangement, while indefinite, was intended to be temporary. Mother and Father agreed to an extended arrangement in which Grandparents took primary responsibility for Heather's daily needs. Certainly Mother and Father *could* have revoked this arrangement at any time, but they chose not to.

In sum, we hold that Grandparents have shown that, for the statutory time period, they (1) shared a principal residence with Heather, (2) provided for Heather's daily physical and psychological needs, and (3) exercised guidance, governance, and direction similar to that typically exercised on a day-to-day basis by parents with their children. Accordingly, Grandparents "had actual care, control, and possession" of Heather "for at least six months ending not more than 90 days preceding the date of the filing of the petition" and therefore had standing to file their petition.

Having determined that Grandparents had standing under the statute's plain language, we turn to the constitutional implications of nonparent standing.

### C. *Troxel*

In confining nonparent standing under section 102.003(a)(9) to those instances in which the child's parent "is unfit or has abdicated his or her own care, control, and possession," the court of appeals relied in part on *Troxel v. Granville*, in which the United States Supreme Court invalidated a Washington visitation statute because it unconstitutionally interfered with "the fundamental right of parents to make child rearing decisions." 530 U.S. 57, 72–73 (2000) (plurality opinion). For several reasons, *Troxel* does not require or justify adding language to section 102.003(a)(9) that the Legislature chose not to include.

16

The visitation statute at issue in *Troxel* permitted "[a]ny person" to petition for visitation rights "at any time" and allowed the court to "order visitation rights for any person when visitation may serve the best interest of the child." *Id.* at 61. Relying on this statute, the children's paternal grandparents petitioned the court for visitation rights after the children's father died. *Id.* at 60. Although the mother wished to limit visitation to one non-overnight visit per month, the trial court ordered significantly more, finding it to be in the children's best interest. *Id.* at 61. The Washington Supreme Court concluded the statute was unconstitutional, and the United States Supreme Court affirmed. *Id.* at 63.

The plurality in *Troxel* emphasized that the statute at issue was "breathtakingly broad," permitting "any third party seeking visitation to subject any decision by a parent concerning visitation of the parent's children" to court review. *Id.* at 67. The plurality further faulted the statute for according no weight to a parent's decision that visitation would not be in the children's best interest. *Id.* The statute thus allowed a judge to "disregard and overturn *any* decision by a fit custodial parent concerning visitation whenever a third party affected by the decision files a visitation petition, based solely on the judge's determination of the child's best interests." *Id.* Having rested its decision on "the sweeping breadth" of the statute at issue, the plurality nevertheless also noted that "the constitutionality of any standard for awarding visitation turns on the specific manner in which that standard is applied and that the constitutional protections in this area are best 'elaborated with care.'" *Id.* at 73; *see also id.* at 100–01 (Kennedy, J., dissenting) (noting that "a fit parent's right vis-à-vis a complete stranger is one thing; her right vis-à-vis another parent or a *de facto* parent may be another").

In stark contrast to the Washington statute at issue in *Troxel*, section 102.003(a)(9) does not allow "any" nonparent to file a SAPCR; it allows only nonparents who have exercised "actual care, control, and possession" of a child for at least six months to do so. The nonparent standing threshold in Texas is thus much higher and narrower than the one rejected in *Troxel*. *See In re Fountain*, No. 01-11-00198-CV, 2011 WL 1755550, at *2 (Tex. App.—Houston [1st Dist.] May 2, 2011, orig. proceeding) (mem. op.) (noting that "the Legislature has provided a restricted and considerably more tailored standard for standing than 'any person'"). Nor does section 102.003 govern the merits of a SAPCR; again, the statute addresses only who may file a suit affecting the parent–child relationship, not what a petitioner must show to obtain the relief she seeks. The merits of a SAPCR petition are governed by other statutes that contain additional safeguards. *See, e.g.,* TEX. FAM. CODE § 153.131 (the appointment of the parent or parents as managing conservators is in the child's best interest unless the court finds that the appointment "would significantly impair the child's physical health or emotional development").

*Troxel* thus involved a materially different statute and petitioners who had not lived with, cared for, and managed the children at issue on a day-to-day basis over an extended period of time. *See* 530 U.S. at 100–01 (Kennedy, J., dissenting). The dissent fails to appreciate these important distinctions, mischaracterizing this case as a *Troxel*-type "grandparent-access case." *Post* at ___. However, this case involves nonparents who have exercised "actual care, control and possession" with the parents' agreement, while *Troxel* involved grandparents who had never lived with the child or played a parent-like role in the child's life.

Courts in other jurisdictions have also "declined to treat *Troxel* as a bar to recognizing *de facto* parenthood or other designations used to describe third parties who have assumed a parental

18

role." *Conover v. Conover*, 141 A.3d 31, 43 (Md. 2016) (collecting cases).[16] These courts recognize the distinction between ordinary third parties and those "who have played an unusual and significant parent-like role in a child's life." *C.E.W. v. D.E.W.*, 845 A.2d 1146, 1149 (Me. 2004); *see also Conover*, 141 A.3d at 51 (reasoning that treating de facto parents as distinct from other third parties is not only consistent with *Troxel*, but also considers "the benefits a child gains when there is consistency in the child's close, nurturing relationships"); *M.J.S. v. B.B.*, 172 A.3d 651, 656 (Pa. Super. Ct. 2017) (holding that grandmother, who shared with her daughter the responsibility of raising her grandchild and who satisfied the child's "daily physical, emotional, and financial needs for his entire life," was much more than a "glorified baby-sitter" and could sue for custody as a person who stood in loco parentis to the child).[17]

In Texas, section 102.003(a)(9) recognizes that distinction and, properly construed, limits nonparent standing to persons "who have played an unusual and significant parent-like role in a child's life." *C.E.W.*, 845 A.2d at 1149. So construed, it does not unconstitutionally interfere with parents' fundamental liberty interest in raising their children.[18]

---

[16] The concept of de facto parenthood has been widely adopted in various iterations. *See, e.g.*, *T.B. v. L.R.M.*, 786 A.2d 913, 918–19 (Pa. 2001) (recognizing the status of in loco parentis); *V.C. v. M.J.B.*, 748 A.2d 539, 549–50 (N.J. 2000) (recognizing the status of "psychological parent"); *In re Custody of H.S.H.-K.*, 533 N.W.2d 419, 435 (Wis. 1995) (permitting a person in a "parent-like" relationship with the child to petition for visitation). In some states, the doctrine is recognized as a matter of common law, *see, e.g.*, *In re Custody of H.S.H.-K.*, 533 N.W.2d at 435–36 (adopting four-part test for de facto parenthood), while in others it is governed by statute, *see, e.g.*, *Smith v. Guest*, 16 A.3d 920, 931–32 (Del. 2011) (upholding the constitutionality of Delaware's statute conferring standing on de facto parents).

[17] The dissent accuses us of "brush[ing] aside the constitutional concerns raised by Mother, Father, and the court of appeals." *Post* at ___. We do no such thing. We merely decline to expand the parameters of the rights at issue beyond those recognized by the Supreme Court, consistent with the numerous courts in this and other jurisdictions that have reviewed nonparent standing issues in light of *Troxel*. The dissent stops short of opining that the nonparent standing statute as we have construed it is unconstitutional, instead implying that the dissent's interpretation is essentially *more* constitutional. We decline to wade into such murky waters in the face of an unambiguous statute that does not unconstitutionally interfere with a parent's rights.

[18] This is consistent with the draft Uniform Nonparent Custody and Visitation Act, scheduled for a final vote by the Uniform Law Commission in July 2018 and expressly drafted with *Troxel* in mind. *See* UNIFORM NONPARENT

## IV. Conclusion

Parental rights are fundamental, but neither the Texas Family Code nor the Constitution treats them as plenary and unchecked. The Family Code recognizes that a narrow class of nonparents, who have served in a parent-like role to a child over an extended period of time, may come to court and seek to preserve that relationship, over a parent's objections. We hold that Grandparents fall into that class, although we express no opinion on whether Grandparents are entitled to conservatorship or visitation rights with respect to Heather. We therefore reverse the court of appeals' judgment and remand the case to the trial court to determine the merits of Grandparents' petition.

_____

Debra H. Lehrmann
Justice

**OPINION DELIVERED:** June 15, 2018

---

CUSTODY AND VISITATION ACT Prefatory Note (UNIF. LAW COMM'N, Annual Meeting Draft 2018). Under the draft Uniform Act, a court may award custody or visitation to a nonparent who is a "consistent caretaker" of the child if the award would be in the child's best interest. *Id.* § 4(a). A nonparent is a "consistent caretaker" if he proves that he,

> without expectation of compensation: (1) lived with the child for not less than 12 months, unless the court finds good cause to accept a shorter period; (2) regularly exercised care of the child; (3) made day-to-day decisions regarding the child solely or in cooperation with a custodian of the child; and (4) established a bonded and dependent relationship with the child with the express or implied consent of a parent of the child, or without the consent of a parent if no parent has been able or willing to perform parenting functions.

*Id.* § 4(b).