**Opinion filed February 10, 2022**



In The

# Eleventh Court of Appeals

_____

## No. 11-21-00040-CV

_____

## IN THE INTEREST OF E.N.D., A CHILD

**On Appeal from the 326th District Court**
**Taylor County, Texas**
**Trial Court Cause No. 48,214-C**

### M E M O R A N D U M   O P I N I O N

This is an appeal from a final order in a suit affecting the parent-child relationship. The trial court awarded E.N.D.'s father, P.L.D., certain exclusive rights, including the exclusive right to designate E.N.D.'s primary residence. E.N.D.'s mother, S.R.F., appeals and, in three issues, contends that the trial court abused its discretion by modifying conservatorship without making any finding of a material and substantial change in circumstances, by modifying conservatorship without any evidence of a material and substantial change in circumstances, and by

finding that a modification of conservatorship was in E.N.D.'s best interest. We affirm the trial court's order.

*Background*

P.L.D. and S.R.F. separated shortly before E.N.D. was born in August 2013. P.L.D. saw E.N.D. at the hospital and then did not see E.N.D. again for ten or eleven months. On December 17, 2014, P.L.D. filed an original petition in suit affecting the parent–child relationship and requested that he and S.R.F. be named joint managing conservators of E.N.D., that he be given the exclusive right to designate E.N.D.'s primary residence, and that S.R.F. be required to pay child support and medical support for E.N.D. Alternatively, P.L.D. requested that he be granted visitation with E.N.D. P.L.D. also requested that the trial court enter temporary orders for the safety and welfare of E.N.D.

In a counterpetition, S.R.F. asserted that it would not be in E.N.D.'s best interest to appoint her and P.L.D. as joint managing conservators and requested that she be appointed E.N.D.'s sole managing conservator or, alternatively, be appointed joint managing conservator with the exclusive right to designate E.N.D.'s primary residence. S.R.F. also requested that P.L.D. be ordered to pay child support and medical support for E.N.D. and that the trial court enter temporary orders for E.N.D.'s safety and welfare.

On January 19, 2015, P.L.D. and S.R.F. signed a "MEDIATED SETTLEMENT AGREEMENT as to Temp. Order." The term "as to Temp. Order" was handwritten beside the typed term "MEDIATED SETTLEMENT AGREEMENT." S.R.F. and P.L.D. "agree[d] to settle all claims and controversies between them" as set out in the agreement and that the case would "be resolved by an Agreed Order In Suit Affecting the Parent Child Relationship." S.R.F. and P.L.D. acknowledged that the agreement was in E.N.D.'s best interest.

On February 25, 2015, the trial court signed temporary orders based on the mediated settlement agreement. The trial court adjudicated P.L.D. to be E.N.D.'s father and changed E.N.D.'s surname, appointed S.R.F. and P.L.D. as E.N.D.'s temporary joint managing conservators, ordered that S.R.F. had the exclusive right to designate E.N.D.'s primary residence, entered a possession order for P.L.D.'s access to E.N.D., and ordered P.L.D. to pay child support of $325 per month and to maintain health insurance for E.N.D. The trial court ordered that the temporary orders "shall continue in force until the signing of the final order or until further order of this Court."

On February 28, 2017, P.L.D. filed a motion for enforcement of the temporary orders and alleged that S.R.F. had denied P.L.D. possession of E.N.D. on thirty-eight occasions between September 1, 2016, and February 23, 2017. After the motion for enforcement was filed, S.R.F. allowed P.L.D. to have visitation with E.N.D. The record reflects no further activity in the case until June 25, 2018, when P.L.D. requested that the case be set for final hearing. The trial court set the case for trial during the week of January 22, 2019.

On September 27, 2018, P.L.D. filed a motion for enforcement in which he alleged that S.R.F. had refused to allow P.L.D. to have possession of E.N.D on three occasions in September 2018 and had indicated that she did not intend to allow any additional visitation until January 2019. Although the pleading is not in the record, at some point S.R.F. filed a motion for enforcement of child support. The trial court heard the competing motions to enforce on December 12, 2018.

The case was set for final hearing on January 24, 2019. On the day of trial, S.R.F. filed a motion for mediation. The trial court reset the final hearing for February 28, 2019. The case was unsuccessfully mediated on March 22, 2019, and, on May 8, 2019, P.L.D. requested that the case be set for final hearing. On

January 14, 2020, P.L.D. again requested that the case be set for final hearing. On January 31, 2020, the trial court set the case for final hearing on April 21, 2020.

On April 30, 2020, the trial court entered an order of enforcement by contempt based on the December 12, 2018 hearing on P.L.D.'s and S.R.F.'s motions for enforcement. The trial court found that both P.L.D. and S.R.F. were guilty of one violation of the trial court's order; that, as of December 12, 2018, P.L.D. was in arrears on his child support obligations in the amount of $8,967.92, but was entitled to a credit of direct payment in the amount of $3,750; and that P.L.D. was entitled to additional periods of possession to compensate for the periods of possession denied by S.R.F. The trial court ordered both S.R.F. and P.L.D. to be confined for a period not to exceed 180 days but suspended that confinement for one year on the conditions that P.L.D. continued to pay current child support and child support arrearages and that S.R.F. complied with all periods of possession and access awarded to P.L.D.

On July 16, 2020, the trial court set the case for final hearing on November 10, 2020. The case was tried with the parties and their counsel appearing remotely. P.L.D. and S.R.F. were the only two witnesses at trial.

P.L.D. testified that after he and S.R.F. separated, he was not allowed to have any involvement in the pregnancy and was not notified when E.N.D. was born. After he learned that E.N.D. had been born, P.L.D. went to the hospital and saw E.N.D. P.L.D. admitted that he had been arrested for the possession of marijuana, but was inconsistent about whether that arrest was before or after E.N.D. was born.

In 2014, P.L.D. moved to San Angelo and had lived in his current house for four years. At the time of the hearing, P.L.D.'s wife, stepchild, and baby daughter lived with him. According to P.L.D., he had two girlfriends who had met E.N.D. According to S.R.F., P.L.D did not tell her when he began living with his second

4

girlfriend or when he married her. S.R.F. also believed that P.L.D. had introduced a third girlfriend to E.N.D.

P.L.D. had held four jobs since E.N.D. was born but testified that each job change was for an increase in pay. In his current job, P.L.D. worked ten days and then was off for five days and then repeated the schedule on the night shift. P.L.D. admitted that he was working much of the time that he was scheduled to have possession of E.N.D. P.L.D. often allowed his family to exercise his scheduled Thursday visits and would FaceTime with E.N.D. during the visit.

S.R.F. had had a much more complicated personal life since E.N.D.'s birth. S.R.F. began living with Priscilla Gil shortly after E.N.D. was born. At some point, S.R.F. married Gil and moved into Gil's parents' house with Gil and E.N.D. S.R.F. does not recall if she told P.L.D that she had married Gil. Gil's parents cared for E.N.D. every day. In 2016, S.R.F. filed for divorce from Gil and moved into an apartment with E.N.D.

Approximately four months after she separated from Gil, S.R.F. began a relationship with "Lexi,"[1] and Lexi moved into the apartment with S.R.F. and E.N.D. S.R.F. could not recall if P.L.D. knew that Lexi had moved into the apartment. Approximately two months later, Gil asked S.R.F. to work on their marriage. S.R.F. ended her relationship with Lexi, and Gil moved into the apartment with S.R.F. and E.N.D. S.R.F. did not tell P.L.D. that she had reunited with Gil or that Gil had moved into the apartment. When the lease on the apartment expired, Gil, S.R.F., and E.N.D. moved back into Gil's parents' house, then into the house behind Gil's parents' house, and finally into a condominium. Gil's father continued to care for E.N.D.

According to P.L.D., S.R.F. sent some text messages that caused his wife to have some concerns. When S.R.F. and Gil came to pick up E.N.D., P.L.D.'s wife

---

[1]The record does not contain Lexi's surname.

asked S.R.F. not to send those type of messages. Gil was surprised to hear about the messages and hit S.R.F., who was holding E.N.D.

S.R.F. denied that Gil ever hit her. However, she admitted that Gil "resorted to any kind of argument with violence." Although S.R.F. attempted to avoid arguments, there were "a couple of times" that Gil pushed her. S.R.F. testified that, other than the occasion at P.L.D.'s house, E.N.D. was not present when Gil pushed her. According to S.R.F., Gil made it very difficult for her to have a relationship of any kind with P.L.D. and Gil and her father were the instigators behind denying P.L.D. access to E.N.D.

S.R.F. separated from Gil again in November 2018, and their divorce was final May 10, 2019.[2] S.R.F. does not recall if she told P.L.D. that she and Gil were divorced. Although S.R.F. referred to Gil as E.N.D.'s "mom," and Gil's father was "very much a paternal figure" to E.N.D., E.N.D had not seen Gil or her parents since November 2018.

In early July 2019, S.R.F. and E.N.D. moved into Danae Proffit's house.[3] According to S.R.F., her relationship with Proffit was not physical when she and E.N.D. moved into the house and she could not recall how quickly she began a physical relationship with Proffit. S.R.F. married Proffit in January 2020 but did not tell P.L.D. about the marriage. Proffit sold her house and, about a month before trial, Proffit, S.R.F., and E.N.D. moved into a travel trailer while their new house was

---

[2]Although S.R.F. initially testified that she separated from Gil in November 2017 and that her divorce from Gil was final in 2018, she agreed that if the "registry" showed that the divorce was final May 10, 2019, then 2019 was the correct date.

[3]S.R.F. initially testified that she moved into Proffit's house in July 2018. However, she also testified that she moved into Proffit's house in July after the divorce from Gil was final, that she lived there for approximately a year, and that Proffitt sold the house approximately a month before the November 10, 2020 hearing. S.R.F. was admittedly confused about the timeline, but ultimately agreed that her divorce from Gil was final in May 2019. Therefore, S.R.F. and E.N.D. necessarily moved into Proffit's house in July 2019.

being constructed. Based on the location of their new house, E.N.D. would be required to change schools.

According to P.L.D., he and S.R.F. agreed in the mediation for the temporary orders that they would jointly make all decisions concerning E.N.D. However, toward the end of 2016, S.R.F. denied him access to E.N.D., and he did not see E.N.D. again until the summer of 2017. In 2018, S.R.F. again denied P.L.D. access to E.N.D. and changed E.N.D.'s school without notifying P.L.D. P.L.D. lost part of his summer possession because of the day that E.N.D.'s new school started in August. P.L.D. and S.R.F. also failed to agree on extracurricular activities for E.N.D. and did not communicate about equipment that was needed for any particular activity. According to P.L.D., he tried to talk to S.R.F. on multiple occasions about different things and S.R.F. would not respond. S.R.F. agreed that she and P.L.D. had each just been doing what they wanted to do for E.N.D. instead of both being "team [E.N.D.]".

S.R.F. testified that she was concerned that, on six occasions, E.N.D.'s face was bruised or cut while he was in P.L.D.'s or P.L.D.'s mother's possession. On two of those occasions, E.N.D. required stitches, and S.R.F. believed that she was not immediately notified that E.N.D. needed stitches. P.L.D. testified that he was aware of only three occasions when E.N.D. was bruised or cut, that E.N.D. was "just being a kid running around," and that S.R.F. was notified of what happened in a timely manner.

P.L.D. testified that he did not consider himself to be a "greater parent" just because he was in a heterosexual relationship but that he did not believe that E.N.D. was in a good environment. P.L.D. testified that he knew "for sure" that S.R.F.'s first marriage was an unfit environment and that he does not know "what goes on" in S.R.F.'s current home. P.L.D. believed that there were multiple instances of

domestic violence between S.R.F. and Gil and indicated that he could not be certain that S.R.F. "wouldn't allow that again."

P.L.D. testified that E.N.D. was wearing jewelry that P.L.D. considered to be too feminine, and that he thought that it was "morally right" to be in a heterosexual relationship, that E.N.D. was in an environment that forced him to think a certain way that was not healthy, and that E.N.D. needed to be provided "an encourageable way of living." P.L.D. was concerned that S.R.F. had had "multiple girlfriends, partners, individuals" that she had introduced to E.N.D.; that S.R.F. was going from relationship to relationship; that S.R.F. had asked if her girlfriends could adopt E.N.D.; that S.R.F. pushed her partners into a parenting role above P.L.D. and attempted to push P.L.D. out; and that E.N.D.'s relationship with these women and their families ended when S.R.F.'s relationship with the person ended. In P.L.D.'s opinion, S.R.F. had failed to provide E.N.D. with a stable home and it was in E.N.D.'s best interest for P.L.D. to be allowed to designate E.N.D.'s primary residence.

S.R.F. testified that she understood "the concern about going from relationship to relationship." However, because she did not have her own house, E.N.D. was introduced to individuals that S.R.F. dated at the same time that S.R.F. initiated the relationships. S.R.F. denied that she was trying to influence E.N.D. to be "gay" through her choice of extracurricular activities and testified that she thought that telling E.N.D. to remove the girl's hair ties that he wore as jewelry was a bigger issue than just letting him wear the hair ties. S.R.F., however, admitted that she had given E.N.D. the hair tie that P.L.D. found concerning.

S.R.F. testified that she and E.N.D. were "super close, that E.N.D. was her best friend, and that it would devastate E.N.D. to live with P.L.D. Although P.L.D. did not believe that his relationship with S.R.F. had changed significantly, in S.R.F.'s opinion, the relationship had significantly improved after the enforcement

hearing. S.R.F. requested that the temporary orders continue and that she be allowed to designate E.N.D.'s primary residence.

At the end of the hearing, the trial court noted that the P.L.D. and S.R.F. needed to communicate, that both P.L.D. and S.R.F. had failed to communicate on "major things," and that E.N.D. was "going to pay the price." In its "Order in Suit Affecting the Parent-Child Relationship," the trial court adjudicated P.L.D. to be the parent of E.N.D.; named S.R.F. and P.L.D. joint managing conservators of E.N.D.; ordered that P.L.D. had a number of exclusive rights pertaining to E.N.D., including the exclusive right to designate E.N.D.'s primary residence;[4] ordered that S.R.F. was entitled to possession and access to E.N.D. pursuant to the standard possession order; and ordered S.R.F. to pay child support in the amount of $800 per month and to provide health insurance for E.N.D.

In response to S.R.F.'s request for findings of fact and conclusions of law, the trial court found that (1) P.L.D. and S.R.F. were unable to reach shared decisions in E.N.D.'s best interest, (2) S.R.F. did not live in the same city as P.L.D., and (3) E.N.D. would not benefit from P.L.D. and S.R.F. making joint or independent decisions about E.N.D.'s physical, psychological, or emotional needs and development. The trial court concluded that, in order to effectuate the best interest of E.N.D., P.L.D. should exclusively exercise the rights and duties of a parent as provided by Chapter 151 of the Texas Family Code.

---

[4]The trial court ordered that P.L.D. had the exclusive right (1) to designate E.N.D.'s primary residence without regard to geographic location; (2) to consent to medical, dental, and surgical treatment involving invasive procedures; (3) to consent to psychiatric and psychological treatment of E.N.D.; (4) to receive child support payments and to hold or disburse the funds for E.N.D.'s benefit; (5) to represent E.N.D. in legal actions and to make other decisions of substantial legal significance concerning E.N.D.; (6) to consent to marriage and to enlistment in the armed forces of the United States; (7) to make decisions regarding E.N.D.'s education; (8) to the services and earnings of E.N.D., unless provided otherwise by Section 265.0111 of the Texas Family Code; (9) to act as an agent of E.N.D. in relation to E.N.D.'s estate, unless a guardian of the estate or a guardian or attorney ad litem was appointed; (10) to apply for, renew, and maintain possession of a passport for E.N.D.; and (11) to manage E.N.D.'s estate to the extent that the estate had been created by the community or joint property of the parent.

*Analysis*

In three issues, S.R.F. asserts that the trial court abused its discretion when it awarded primary custody of E.N.D. to P.L.D. (1) without making any finding of a material and substantial change in circumstances, (2) by modifying conservatorship without sufficient evidence of a material and substantial change, and (3) by finding that a modification was in E.N.D.'s best interest.

## A. Standard of Review

We review a trial court's decision on issues of conservatorship and possession of a child for a clear abuse of discretion. *In re A.J.E.*, 372 S.W.3d 696, 698 (Tex. App.—Eastland 2012, no pet.); *see also In re J.A.J.*, 243 S.W.3d 611, 616 (Tex. 2007). A trial court abuses its discretion if it acts unreasonably, arbitrarily, or without reference to guiding principles or when it fails to correctly analyze or apply the law. *A.J.E.*, 372 S.W.3d at 698; *see also J.A.J.*, 243 S.W.3d at 616

In family law cases, challenges to legal and factual sufficiency are not independent grounds of error but factors used to determine whether the trial court abused its discretion. *In re K.T.R.*, No. 11-20-00031-CV, 2020 WL 4379063, at *2 (Tex. App.—Eastland July 31, 2020, no pet.) (mem. op.). In determining whether the trial court abused its discretion, we consider whether it had sufficient information upon which to exercise its discretion and, if so, whether it erred in the application of that discretion. *In re J.H.C.*, No. 11-17-00187-CV, 2019 WL 2557542, at *6 (Tex. App.—Eastland June 20, 2019, no pet.) (mem. op.). The review of the sufficiency of the evidence is part of the first inquiry. *Id.* After we assess the evidence, we consider whether, based on that evidence, the trial court made a reasonable decision. *Id.*

In conducting our analysis, we keep in mind that conservatorship determinations are "intensely fact driven," *Lenz v. Lenz*, 79 S.W.3d 10, 19 (Tex. 2002), and that the trial court "is in a better position to determine what will be in the

best interest of the child since it faced the parties and their witnesses, observed their demeanor, and had the opportunity to evaluate the claims made by each parent," *J.H.C.*, 2019 WL 2557542, at *6 (quoting *In re J.R.D.*, 169 S.W.3d 740, 743 (Tex. App.—Austin 2005, pet. denied)); *see also Pore v. Ellis*, No. 03-20-00550-CV, 2021 WL 5095496, at *3 (Tex. App.—Austin Nov. 3, 2021, no pet.) (mem. op.) ("A factfinder's decision on conflicts in the evidence is generally viewed as conclusive."). A trial court does not abuse its discretion when it bases its decision on conflicting evidence so long as there is some evidence of a substantive and probative character that supports the decision. *J.H.C.*, 2019 WL 2557542, at *6; *A.J.E.*, 372 S.W.3d at 699.

## B. Nature of the Proceeding

In her first two issues, S.R.F. argues that the trial court abused its discretion when it modified conservatorship without making a finding of a material and substantial change in circumstances and without sufficient evidence of such a change. S.R.F.'s argument is premised on the position that the temporary orders entered by the trial court were actually a final order and that, because the temporary orders were a final order, P.L.D. was seeking a modification of the order under Section 156.101 of the Texas Family Code. If P.L.D. was seeking a modification, rather than an initial custody determination, he had the burden to establish that the modification of primary conservatorship was in E.N.D.'s best interest and that the circumstances of the child, a conservator, or other party affected by the order had materially and substantially changed since the date of the prior order. *See* TEX. FAM. CODE ANN. § 156.101(1) (West 2014).

We initially question whether S.R.F. has preserved these complaints for our review. *See* TEX. R. APP. P. 33.1. S.R.F. did not argue in the trial court that the temporary orders were final or that P.L.D. was required to prove a material and substantial change in circumstances since the temporary orders were signed.

11

Further, S.R.F.'s counsel affirmatively represented to the trial court that the hearing was based on P.L.D.'s original petition for an initial custody determination. After the trial court made findings of fact and conclusions of law, S.R.F. did not request additional findings based on the theory that the temporary orders were final and that the trial court was required to modify the temporary orders rather than make an initial custody determination. However, even if preserved, S.R.F.'s complaints have no merit.

"The differences between an *original* conservatorship suit and a modification action are 'more than procedural or semantic.'" *In re R.T.K.*, 324 S.W.3d 896, 900 (Tex. App.—Houston [14th Dist.] 2010, pet. denied) (quoting *In re C.A.M.M.*, 243 S.W.3d 211, 215 (Tex. App.—Houston [14th Dist.] 2007, pet. denied)). Rather, distinct statutory schemes designed to address different policy issues, and with different standards and burdens of proof, are applicable to original and modification suits. *In re V.L.K.*, 24 S.W.3d 338, 343 (Tex. 2000). Original custody disputes are governed by Chapter 153 of the Texas Family Code while modification suits are governed by Chapter 156. *Id.* at 342–43. Although the overriding concern in both chapters is the best interest of the child, *see* FAM. § 153.002, a modification suit presents additional policy concerns, "such as stability for the child and the need to prevent constant litigation in child custody cases." *V.L.K.*, 24 S.W.3d at 343.

The statutory requirements for a modification do not apply until a final custody determination has been signed by the trial court. *See id.* at 342 ("After a court makes an original custody determination, a party may move to modify that determination."); *In re McPeak*, 525 S.W.3d 310, 312 (Tex. App.—Houston [14th Dist.] 2017, orig. proceeding) ("Section 156.102 only applies to a motion to modify a *final* order that designates the person having the exclusive right to designate the primary residence of a child."); *Normand v. Fox*, 940 S.W.2d 401, 403 (Tex. App.—Waco 1997, no pet.) ("[A] suit for modification is a new lawsuit filed after the

rendition of a final order."). Therefore, the provisions of Chapter 156, including the requirement that the person seeking modification show a material and substantial change in circumstances, apply only if P.L.D. was seeking the modification of a final order rather than an initial custody determination.

If the substance of an order amounts to a final decree, incidental labels are not controlling. *Brines v. McIlhaney*, 596 S.W.2d 519, 524 (Tex. 1980) (orig. proceeding). Rather, it is the character and function that determine an order's classification. *Del Valle Ind. Sch. Dist. v. Lopez*, 845 S.W.2d 808, 809 (Tex. 1992). When there has not been a conventional trial on the merits, an order is final "if it actually disposes of every pending claim or party" or "if it clearly and unequivocally states that it finally disposes of all claims and all parties." *Lehmann v. Har-Con Corp.*, 39 S.W.3d 191, 205 (Tex. 2001); *see also In re H.C.C.*, No. 01-16-00876-CV, 2017 WL 6520228, at *5 (Tex. App.—Houston [1st Dist.] Dec. 21, 2017, no pet.) (mem. op.). "If there is any doubt as to the judgment's finality," we should review the record to determine whether the trial court intended the judgment to be final. *In re R.R.K.*, 590 S.W.3d 535, 541 (Tex. 2019) (quoting *Vaughn v. Drennon*, 324 S.W.3d 560, 561 (Tex. 2010)).

A trial court may enter temporary orders before final order in a suit affecting the parent–child relationship, including an order for the temporary conservatorship of the child and for temporary support of the child. FAM. § 105.001(a)(1)–(2). In *Brines v. McIlhaney*, the Texas Supreme Court held that an order in a divorce decree labeling the conservatorship of the children as "temporary orders only" and specifying that the orders would remain in effect "until further order of this court" was a final order because no issue was expressly left unadjudicated in the decree, the decree expressly stated that "all matters in controversy . . . were submitted to the Court," and no provision was made for any other or further hearing. 596 S.W.2d at 522–23. Relying on *Brines*, S.R.F. asserts (1) that, because she and P.L.D. were not

married, the temporary orders disposed of all the issues between the parties and (2) that by operating under the temporary orders for an extended period of time, P.L.D. "clearly acquiesced in the treatment of them as more than 'temporary orders.'" We disagree.

First, on their face, the temporary orders do not meet the statutory requirements for a final order. *See* FAM. § 105.006; *R.R.K.*, 590 S.W.3d at 540 (Section 105.006 of the Texas Family Code "provides a framework for what final orders must say in suits affecting the parent–child relationship."). Specifically, the temporary orders do not contain the information required by Section 105.006(a)(1): S.R.F.'s and P.L.D.'s social security numbers, driver's license numbers, current residence addresses, mailing addresses, home telephone number, names of employers, addresses of employment, and work telephone numbers. *See* FAM. § 105.006(a)(1). Section 105.006 also requires that certain warnings be prominently featured in a final order. *Id.* § 105.006(d)–(e-2). The trial court, however, did not include all the required warnings in the temporary orders. *See id.* § 105.006(e). "While a missing required element does not conclusively negate finality, a failure to include multiple required elements suggests ambiguity as to the court's intent" to enter a final order. *R.R.K.*, 590 S.W.3d at 542.

Further, in the temporary orders, the trial court did not state that all matters in controversy had been submitted for consideration and did not resolve P.L.D.'s and S.R.F.'s requests for permanent relief or for attorney's fees. The trial court also specifically ordered that the temporary orders were to remain in effect until "the signing of the final order or until further order" of the trial court and clearly contemplated additional proceedings that would lead to a final order in the case. Because the trial court did not resolve all issues between the parties and did not express a clear intent to grant permanent relief as to all claims and all parties, the temporary orders entered by the trial court were not a final order.

14

S.R.F.'s complaint that P.L.D. is essentially estopped from contesting that the temporary orders are actually a final order is also without merit. Even if a party's conduct could cause an order that the trial court did not intend to be final to become final, P.L.D.'s conduct in this case did not do so. The temporary orders were signed on February 25, 2015. After S.R.F. denied P.L.D. possession of E.N.D. in 2016, P.L.D. consulted a lawyer. Although it took P.L.D. some time to acquire the funds to pay the attorney's fees, he filed a motion to enforce on February 28, 2017. Between June 24, 2018, and January 14, 2020, P.L.D. requested three times that the case be set for final hearing, and the case was actually set for final hearing four times between January 22, 2019, and November 10, 2020. Although it would be a better practice to move to final hearing in a much more expeditious fashion, we cannot say that P.L.D.'s conduct somehow estopped him from pursuing a final order on an initial custody determination.

Because the challenged order on suit affecting the parent–child relationship signed by the trial court was an initial final order, and not a modification of a prior final order, P.L.D. did not have the burden to show a material and substantial change in the circumstances affecting E.N.D., a conservator, or another party impacted by the order and the trial court was not required to make a finding of such a change. We resolve S.R.F.'s first and second issues against her.

### C. Best Interest of the Child

In her third issue, S.R.F. contends that the trial court abused its discretion in modifying conservatorship because it did not have sufficient evidence that such a change was in E.N.D.'s best interest. As discussed above, this is an original custody case, not a modification proceeding, and we question whether S.R.F. preserved this issue for our review. However, because the best interest of the child is always the primary focus of conservatorship issues, FAM. § 153.002, we will address S.R.F.'s complaint that the trial court abused its discretion when it determined that it was in

E.N.D.'s best interest "to give [P.L.D.] primary custody and all decision-making power over [E.N.D.'s] life."

The trial court is given wide latitude in determining the best interest of the child. *Gillespie v. Gillespie*, 644 S.W.2d 449, 451 (Tex. 1982). In making that determination, the trial court can consider factors such as: (1) the desires of the child, (2) the emotional and physical needs of the child now and in the future, (3) the emotional and physical danger to the child now and in the future, (4) the parental abilities of the individuals seeking custody, (5) the programs available to assist the individual to promote the best interest of the child, (6) the plans for the child by the individual seeking custody, (7) the stability of the home, (8) the acts or omissions of the parent that may indicate that the existing relationship is not a proper one, and (9) any excuse for the acts or omissions of the parent. *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976). "Proof of best interest is not limited to these factors, nor do all factors always apply in every case." *In re S.A.H.*, 420 S.W.3d 911, 926 (Tex. App.—Houston [14th Dist.] 2014, no pet.). Further, although no single factor is controlling, "the presence of a single factor may, in some instances, be sufficient to support the best-interest finding." *D.A.I. v. J.P.L.*, No. 14-20-00109-CV, 2021 WL 3161490, at *5 (Tex. App.—Houston [14th Dist.] July 27, 2021, no pet.) (mem. op.).

Throughout her brief, S.R.F. repeatedly asserts that the trial court's ruling was based on S.R.F.'s same-sex marriage. The trial court, however, (1) found orally at the conclusion of the hearing that S.R.F. and P.L.D. had failed to communicate on major events and (2) found in its findings of fact that S.R.F. and P.L.D. were unable to reach shared decisions in E.N.D.'s best interest and that E.N.D.'s physical, psychological, or emotional needs and development would not benefit from S.R.F. and P.L.D. making joint or independent decisions on those matters. We see nothing in the record to support S.R.F.'s contention that the trial court's decision was based

on S.R.F.'s marriage. We also disagree that the trial court had insufficient evidence of the relevant factors to make a determination of E.N.D.'s best interest.

E.N.D. was seven years old at the time of the hearing and did not testify about his desires. However, S.R.F. testified that she believed that E.N.D. would be devastated if he was sent to live with P.L.D. P.L.D., on the other hand, testified that E.N.D. stayed at P.L.D.'s house during P.L.D.'s periods of possession, got along with his eight-year-old stepbrother, and adored his sister.

As to the emotional and physical needs of E.N.D. now and in the future, there was evidence that P.L.D. had lived in the same house for four years and that E.N.D. stayed in that house during P.L.D.'s periods of possession. Although E.N.D. currently lived in a travel trailer with S.R.F. and Proffit, S.R.F. anticipated that the construction of their new home would be completed within a few months after trial and that E.N.D. would live in that house. Both P.L.D. and S.R.F. were employed and earned a sufficient income to provide for E.N.D.'s other physical needs. Further, the trial court could have inferred, based on the evidence that E.N.D. was well-adjusted doing well in school, and got along with his siblings, that both parents would be able to meet his emotional needs.

The only evidence pertaining to the emotional and physical dangers to E.N.D. now and in the future related to physical injuries that occurred to E.N.D. when he was in the care of P.L.D. or P.L.D.'s mother. However, there was no evidence that those injuries were anything but accidental. Indeed, the only concerns that S.R.F. expressed about the injuries was that she did not think that E.N.D. was being closely supervised and that she was not immediately notified of one of the injuries.

As to P.L.D.'s and S.R.F.'s parental abilities, both parties, with assistance from their families, cared for E.N.D. when he was in their possession. P.L.D. had limited involvement with E.N.D. during the first year of E.N.D.'s life, but testified that S.R.F. did not allow him to be involved. After he was granted visitation with

17

E.N.D., P.L.D. had attempted either personally or through his family to exercise most of his visitation with E.N.D.

The parties' plans for E.N.D. were very similar. S.R.F. intended for E.N.D. to live with her and Proffit in their new home, which would require E.N.D. to attend a new school. P.L.D. intended for E.N.D. to live with P.L.D. and his wife, stepchild, and daughter, and to attend the same charter school that his stepchild attended. Both S.R.F. and P.L.D. intended for E.N.D. to participate in extracurricular activities, although they had not agreed on what those activities would be.

We can consider the final relevant factors, the stability of the home, the acts or omissions of the parent that may indicate that the existing relationship is not a proper one, and any excuse for the acts or omissions of the parent, together. P.L.D. had lived in the same house in San Angelo for four years and, at the time of the hearing, lived with his wife, his stepchild, and his daughter. Since E.N.D.'s birth, P.L.D. had four different jobs, but indicated that each job change was for a better income. P.L.D.'s current job required him to work ten days or nights and then be off for five days or nights. This schedule prevented P.L.D. from exercising all of his visitation with E.N.D., and would presumably affect the time that he could spend with E.N.D. if E.N.D. lived with him.

P.L.D. did not believe that S.F.R. provided a healthy or fit environment for E.N.D. P.L.D. expressed concern about the domestic violence in S.R.F.'s first marriage, the number of relationships that S.R.F. had engaged in, and E.N.D.'s quick introduction to S.R.F.'s partners. Although P.L.D. admitted that he had introduced at least two girlfriends, including the woman that he subsequently married, to E.N.D. and that he lived with his wife prior to their marriage, he denied that he placed his girlfriends in a parenting role. In contrast, S.R.F. introduced at least Gil as E.N.D.'s "mom," asked P.L.D. if her girlfriends could adopt E.N.D., and attempted to supplant P.L.D. as a parent.

P.L.D. had been arrested one time for possession of marijuana. He failed to pay all ordered child support and had not consistently maintained health insurance on E.N.D. However, after the enforcement order was entered, P.L.D. made all his ordered child support and arrearages payments and added E.N.D. to an insurance policy held by P.L.D.'s wife through her employment. Finally, P.L.D. failed to timely communicate with S.R.F. (1) about some of the injuries that E.N.D. sustained, (2) before enrolling E.N.D. in football, and (3) about his girlfriend living with him and their subsequent marriage.

There was evidence that, after S.R.F. and P.L.D. separated, S.R.F. did not allow P.L.D. to participate in her pregnancy, did not inform P.L.D. that E.N.D. had been born, and did not allow P.L.D. to see E.N.D. Shortly after E.N.D.'s birth, S.R.F. moved in with Gil. S.R.F. and Gil got married, a decision that S.R.F. admitted was not "thought out," and moved into Gil's parents' house. S.R.F. allowed Gil's parents to care for E.N.D., and E.N.D. spent a lot of time with Gil's parents.

S.R.F. did not dispute that there was domestic violence in her marriage to Gil. S.R.F. testified that Gil pushed her two times and that E.N.D. was present when one of the incidents occurred. According to P.L.D., however, Gil hit S.R.F. while S.R.F. was holding E.N.D. S.R.F. separated from Gil in 2016, quickly began a relationship with Lexi, and allowed Lexi to live with her and E.N.D. Within a couple of months, S.R.F. terminated her relationship with Lexi, reunited with Gil, and allowed Gil to move in with S.R.F. and E.N.D. Gil, S.R.F. and E.N.D. subsequently moved back to Gil's parents' house, and Gil's parents again provided care for E.N.D. S.R.F. admitted that, when she terminated her relationship with Gil, she also terminated E.N.D.'s relationship with Gil and with Gil's parents. S.R.F. believed that the termination of these relationships was in E.N.D.'s best interest.

After she divorced Gil, S.R.F. and E.N.D. quickly moved into Proffit's house and S.R.F. married Proffit approximately six months later. Proffit sold her house,

and the two women and E.N.D. moved into a travel trailer while their new house was under construction. The location of the new house would require E.N.D. to change schools.

S.R.F. admitted that she had referred to some of her partners as E.N.D.'s "mom," but indicated that she now realized their appropriate role was as a stepmother for E.N.D. S.R.F. also impeded P.L.D.'s exercise of his visitation with E.N.D., but claimed Gil and her father were the cause for the obstruction. Finally, S.R.F. failed to communicate with P.L.D. on a number of matters that affected E.N.D. Specifically, S.R.F. could not recall telling P.L.D. that she had married Gil, that she had allowed Lexi to live with her and E.N.D., that she had reunited with Gil and allowed Gil to move in with her and E.N.D., that she had divorced Gil, or that she had married Proffit. S.R.F. also failed to communicate with P.L.D. about changing E.N.D.'s school, extracurricular activities for E.N.D., and P.L.D.'s concerns about certain jewelry that E.N.D. was wearing. Although S.R.F. believed that she and P.L.D. had been coparenting better, P.L.D. did not believe that their relationship had changed.

Even though the evidence was mixed on some factors and thin on others, there was sufficient evidence (1) that S.R.F. and P.L.D. were unable to reach shared decisions about E.N.D. and (2) that, given S.R.F.'s volatile relationships, quick introductions of E.N.D. to her partners, and abrupt removal and reintroduction of individuals into E.N.D.'s life, E.N.D.'s physical, psychological, or emotional needs and development would not benefit from P.L.D. and S.R.F. making joint decisions on those issues. Because some evidence of a substantive and probative character exists to support the trial court's decision, the trial court did not abuse its discretion by determining that it was in E.N.D.'s best interest to appoint P.L.D. as the person who determined E.N.D.'s primary residence and to give P.L.D. the exclusive right

20

to make certain decisions related to E.N.D.'s education and healthcare, among other matters. We overrule S.R.F.'s third issue.

*This Court's Ruling*

We affirm the trial court's order in suit affecting the parent–child relationship.


JOHN M. BAILEY

CHIEF JUSTICE


February 10, 2022

Panel consists of: Bailey, C.J.,
Trotter, J., and Williams, J.